Allen Wayne JANECKA, Appellant,

v.

The STATE of Texas, Appellee.

No. 68881.

Court of Criminal Appeals of Texas,
En Banc.

Oct. 7, 1987.

On Rehearing Nov. 12, 1987.

Kenneth W. Sparks, Douglas O'Brien, Houston, for appellant.

John B. Holmes, Jr., Dist. Atty., and Timothy G. Taft and Robert A. Moen, Asst. Dist. Attys., Houston, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

PER CURIAM.

Appeal is taken from a conviction for capital murder. V.T.C.A. Penal Code, Sec. 19.03(a)(3). After finding appellant guilty, the jury returned affirmative findings to the first two special issues under Art. 37.-

071(b), V.A.C.C.P. Punishment was assessed at death. We will affirm.[1]

Appellant was convicted of intentionally and knowingly causing the death of Kevin Wanstrath "on or about July 5, 1979" by shooting him with a gun, "and the Defendant committed the murder for remuneration and the promise of remuneration, namely, money."

In his first point of error, appellant complains that the trial court erred in overruling his motion to quash the indictment. The motion stated in pertinent part:

"The indictment is likewise insufficient and defective since it fails to allege the person that allegedly provided the remuneration for the alleged crime ... The failure to name the person providing the remuneration ... leaves the Defendant without proper notice and leaves him unable to properly defend himself on these charges."

In support of his argument that the indictment provided insufficient notice appellant relies primarily on Art. 21.11, V.A.C. C.P., *Brasfield v. State*, 600 S.W.2d 288 (Tex.Cr.App.1980), *King v. State*, 594 S.W. 2d 425 (Tex.Cr.App.1980), *Haecker v. State*, 571 S.W.2d 920 (Tex.Cr.App.1978), and *Drumm v. State*, 560 S.W.2d 944 (Tex.Cr. App.1977). The State denies that *Brasfield*, supra, is implicated by appellant's indictment, but asserts alternatively that it should be overruled.

In order to address appellant's contention, we must review the law concerning notice defects in and form and substance exceptions to an indictment.[2] To do so, we begin with an examination of the case *American Plant Food Corporation v. State*, 508 S.W.2d 598 (Tex.Cr.App.1974). In that case, the defendant corporation was charged with water pollution. On appeal, the defendant argued that the information was insufficient because it did not allege an offense under the law.

This Court stated the following with regard to defects of form and substance in an indictment:

"[T]hat the State's pleading must allege facts sufficient to ... give the defendant notice of precisely what he is charged with, though relating to the substance of the charge in one sense, ... [is] in contemplation of exceptions under Articles 27.08 and 27.09, supra, grounds for an exception to the *form* under Articles 27.-09(2) and 21.21(7), and not for an exception ... [to the substance of the indictment]." [Emphasis added.]

*American Plant Food*, supra at 603. As a defect of form, such an exception to failure of the indictment to provide sufficient notice to the defendant must be raised by motion to quash before the trial court and will not be considered absent such an objection on appeal.

---

**1.** The portion of this opinion not addressing appellant's first point of error was written in large part by Judge Tom Davis before he retired on December 31, 1986, and is adopted, with minor wording changes, by the majority.

**2.** The distinction between form and substance defects in an indictment became less important when the Legislature amended Art. 28.10, V.A.C. C.P., in 1985. Prior to amendment, Art. 28.10, supra, stated:

Any matter of form in an indictment or information may be amended at any time before an announcement of ready for trial upon the merits by both parties, but not afterward. No matter of substance can be amended.

Effective December 1, 1985, Art. 28.10, supra, states:

(a) After notice to the defendant, a matter of form or substance in an indictment or information may be amended at any time before the date the trial on the merits commences. On the request of the defendant, the court shall allow the defendant not less than 10 days, or a shorter period if requested by the defendant, to respond to the amended indictment or information.

(b) A matter of form or substance in an indictment or information may also be amended after the trial on the merits commences if the defendant does not object.

(c) An indictment or information may not be amended over the defendant's objection as to form or substance if the amended indictment or information charges the defendant with an additional or different offense or if the substantial rights of the defendant are prejudiced. Since appellant was indicted in 1980, prior to the passage of the amendment, the old law applied to his case. Thus, although we must address appellant's point of error with regard to the old law, the rulings hereinafter made will have questionable application to indictments filed after the effective date of the amendment, December 1, 1985.

In *Adams v. State,* 707 S.W.2d 900 (Tex. Cr.App.1986), we set forth the test to be applied when a defendant objects to a form defect concerning the notice provided by a charging instrument. In that case, the defendant was charged with obscenity. When he was arrested, two allegedly pornographic films were seized. The information filed against him alleged that he had promoted the sale of an obscene motion picture but did not specify which film of the two seized would be the basis for prosecution.

On appeal, this Court cited *American Plant Food,* supra, for the proposition that the objection made was directed to the form of the information. We decided that according to Art. 21.19, V.A.C.C.P.,[3] when determining whether a defendant had adequate notice to prepare his defense, we must make two inquiries: whether some requisite item of notice was omitted from the charging instrument, and if so, whether the defendant was harmed by the omission. Of course, the record of the particular case must be examined in order to respond to the two questions.

When these two cases are considered together, a conflict with this Court's decision in *Brasfield,* supra, becomes apparent where the defendant was charged with capital murder, committed in the course of committing kidnapping. On appeal, the defendant contended that the trial court should have granted his motion to quash the indictment since the indictment did not name the alleged kidnap victim.

On original submission, Judge Clinton, writing for the majority, agreed with the defendant on the basis of the decision in *King v. State,* 594 S.W.2d 425 (Tex.Cr.App. 1980), and stated, *Brasfield,* supra at 294:

"The finding and holding of *King* make clear that a motion to quash on the grounds stated is *not* directed to omitted *elements* of the 'in-the-course-of offense' mentioned in the indictment but, rather, to 'a *fact* which is crucial to the accused's preparation of his defense to the main

charge of capital murder.'" [Emphasis in original.]

Judge Clinton added:

"The common thread that runs through recent considerations of adequate notice to an accused when raised by motion is that where the underlying statute denouncing the offense prescribes, or permits conviction on, more than one set of circumstances, 'the accused is not required to anticipate any and all variant facts the state might hypothetically seek to establish,' [citation omitted], but by his motion or exception may insist on 'a specific allegation of what the State will rely upon to convict, '....'" [Citations omitted.]

*Id.,* supra at 295.

In an important footnote to the above quoted portion of the opinion, Judge Clinton wrote:

"Since, as pointed out in *Garza,* supra, a simple and easy manner is statutorily provided for curing a defect of form before announcement of ready, the reluctance of a trial judge to require or the resistance of a prosecuting attorney to make the amendment that is responsive to a motion or exception as to form is most difficult to understand. Alternatively, a statement in the record apprising the accused of the name of the victim of the 'in-the-course-of offense' should suffice to show notice was given."

*Brasfield,* supra at 295. Thus, on original submission, we held that the defect raised by the defendant, to-wit: failure of the indictment to allege the name of the victim of the kidnapping, was a defect of form which could have been amended or vitiated by a showing in the record that notice was given.

This holding was reversed by this Court in its Opinion on State's Motion for Rehearing, written by Judge Odom. In this opinion, we set forth the following statutory guide:

1. Article 21.01, V.A.C.C.P., and Article I, Sec. 10 of the Texas Constitution re-

---

**3.** This statute provides "An indictment shall not be held insufficient, nor shall the trial, judgment or other proceedings thereon be affected, by reason of any defect of form which does not prejudice the substantial rights of the defendant."

quire that the indictment be based upon the findings of the grand jury. The findings of the grand jury constitute the substance of the indictment which may not be amended.

2. Article 27.08, V.A.C.C.P., provides that there may be no exception to the substance of an indictment except, among other provisions, that the indictment fails to allege that the defendant committed an offense.

3. Article 27.09, V.A.C.C.P., provides that there may be no exception to the form of an indictment except under Arts. 21.02 and 21.21, which include, among other provisions, that the indictment or information fails to set forth the offense in plain and intelligible words.[4]

4. Article 28.09, V.A.C.C.P., states that defects of form may be amended.

5. Article 28.10, V.A.C.C.P., provided that defects of substance may not be amended. [This article was amended in 1985 to provide that substance defects may be amended. See discussion in footnote 2, *supra*.]

After reviewing the preceding statutes, Judge Odom states:

"A strict reading of these provisions would suggest that any defect under Art. 21.02, supra, could be corrected by amendment pursuant to Arts. 28.09 and 28.10, supra. Such a reading, however, would allow amendment of the very facts found by the grand jury as to the commission of the alleged offense, in abrogation of the constitutional protection of the right to indictment by grand jury before prosecution for a felony, ...."

*Brasfield,* supra at 300. The opinion further states, *id.* at 302:

"The right to indictment by a grand jury before answering a felony charge and the right to notice ride in tandem."

The opinion went on to hold that the defect in the indictment, specifically omission of the name of the kidnapped victim, was one of substance and could not be amended. Thus, the motion for rehearing was overruled and the indictment was ordered dismissed.

In dissent, Judge Clinton agreed with the majority's finding that matters of form contained in the indictment were subject to amendment while matters of substance were not. Issue was taken, however, with the conclusion that a strict reading of the Code of Criminal Procedure would conflict with the constitutional right to indictment by grand jury and that matters of notice could not be amended. Judge Clinton reasoned that clearly an indictment was required to allege that the defendant committed an offense. Moreover, if an indictment failed to allege an offense in contravention of the constitutional directive to the grand jury, such a substantive defect could not be cured by amendment; only the grand jury could correct its own mistake.

When, however, the indictment did allege an offense but the defendant requested additional factual elaboration, such a defect could be cured by amendment. Judge Clinton writes, *id.* supra at 306:

"... [B]ecause it is the constitutional function of the grand jury to find and express in writing facts which constitute 'sufficient cause' to commence a felony prosecution, what the grand jury declares becomes a matter of substance which no one is at liberty to *change, strike,* or *erase.* ... It is equally clear to me that no *addition* can be made to a

---

**4.** We must pause at this point to discuss the application and effect of Art. 21.11, V.A.C.C.P. The opinion in *American Plant Food,* supra, may be read to hold that an exception to the form of an indictment may be made on notice grounds under Art. 21.11, supra.

Article 27.09, supra, lists the *only* exceptions to the form of an indictment and does not refer to Art. 21.11, supra. Thus, an exception to the form of an indictment based on Art. 21.11, per se, notice grounds is not authorized. Since *American Plant Food,* supra, makes it clear that

all notice defects are exceptions to form, then no substance exception could be made under Art. 21.11, supra.

Though Art. 21.11, supra, may not be used as an enumerated exception to form, it is an elucidation of Art. 21.02's "must be set forth in plain and intelligible words" requirement. As such it is appropriate for use in the exception to form context as a more specific complaint under Art. 21.02 (7), thus giving the trial court more particular notice of the exception to the form of the indictment.

fundamentally defective indictment, in order to cure the *fatal* deficiency." [Emphasis in original.]

Since the indictment in the *Brasfield* case contained a notice defect, it should have been subject to amendment.

From the preceding discussion, the conflict between *American Plant Food*, supra, and *Brasfield*, supra, is apparent: a notice defect may not be both a defect of form which may be amended, and a defect of substance which may not be amended. We will resolve this conflict by reaffirming the *American Plant Food*, supra, and *Adams*, supra, holdings, and rejecting the *Brasfield*, supra, analysis.

■ First, we find that the holding in *American Plant Food*, supra, that notice defects in indictments are matters of form, is sound. Thus, if an indictment contains allegations regarding all essential elements of the offense (and is therefore not fundamentally defective), and the defendant seeks additional factual allegations, then the defect raised is one of form. This holding comports with Art. 27.08, supra, and necessarily effects a rejection of the *Brasfield* finding that the right to indictment by a grand jury and notice "ride in tandem." To the extent of conflict, *Brasfield*, supra, is overruled on this issue.

Second, we find that if an indictment is found to allege all of the elements necessary to show commission of an offense and is therefore not fundamentally defective and void, and if a defendant requests additional factual information upon which to prepare his defense, a defect of form has been raised and the State may properly amend the indictment to reflect the requested information. Since such a defect is not directed toward the grand jury's responsibility to make findings and allegations on the essential allegations of the offense, its permission is not necessary prior to amendment of the indictment to reflect the desired factual recitations. Moreover, the Code of Criminal Procedure clearly contemplated such amendment given its direction that only substantive defects may not be altered. This holding also overrules *Brasfield*, supra, to the extent that amendment of purely notice defects is prohibited.

The two other cases cited by appellant may also be distinguished. In *Haecker*, supra, the defendant was convicted of cruelty to animals. On appeal, he contended that the trial court should have granted his motion to quash based upon his allegation that the information, specifically that part alleging "torture", provided inadequate notice. This Court noted that in some cases, an information will be sufficient if it follows the language of the statute, and the statute is completely descriptive of the offense. If, however, the statute is not completely descriptive of the offense, then greater specificity may be required in order to properly allege all of the elements of the offense. This Court found that the additional material requested by the defendant was clearly a matter of form and also was clearly necessary to give the defendant adequate notice with which to prepare a defense.

In so doing, this Court referred to several other decisions such as *Lopez v. State*, 494 S.W.2d 560 (Tex.Cr.App.1973), *Conklin v. State*, 144 Tex.Cr.R. 343, 162 S.W.2d 973 (1942), and *Sassano v. State*, 291 S.W.2d 323 (Tex.Cr.App.1956). Examination of these cases reveals that they concerned indictments and informations that did or did not contain all of the elemental allegations necessary to show an offense. Thus, although not precisely so worded, the cases supporting the *Haecker*, supra, decision dealt with substantive problems in the charging instruments. We categorize the *Haecker* decision as anacronistic to the discussion at hand, but note that it poses no threat to our decision today to reaffirm *American Plant Food*, supra.

The decision in *Drumm*, supra, may also be distinguished. In that case, the defendant was convicted for driving while his license was suspended. He filed a motion to quash before the trial court alleging that the information failed to provide sufficient notice of the nature of the license suspension relied upon by the State for conviction. The motion was overruled. On appeal, the

defendant contended that the motion should have been granted.

Judge Odom, writing for the Court [5] noted first that there were several grounds for suspension under the applicable law. The question before the Court was framed as follows:

"The issue here, however, is not whether the information in the case at bar is defective on its face, but whether it can withstand attack by a motion to quash for failure to give adequate notice on which to prepare a defense."

*Drumm,* supra at 946.

The Court held that a challenge to an accusation for failure to give adequate notice on which to prepare a defense must be asserted in a timely manner, citing *American Plant Food,* supra, and when asserted, fundamental constitutional protections are invoked. The Court then engaged in the examination appropriate for pre-*Adams* cases, and found that the information was insufficient and reversal was mandated. This decision was rendered obsolete when *Adams,* supra, was later decided and the method of assessing harm for notice defects was changed. Thus, *Drumm,* supra, is not applicable to the instant case.

■ Now that the conflict between *American Plant Food,* supra, and *Brasfield,* supra, has been resolved, we may turn to the issues raised in the instant case. Clearly the name of the person providing the remuneration is not an element of the offense of capital murder by murder committed for remuneration. See V.T.C.A. Penal Code, § 19.03(a)(3). Thus, no substance objection could have been levied against the instant indictment. Appellant's contention raised by motion to quash may be properly characterized as an exception to the form of the indictment.

Given that a form objection was made, the *Adams,* supra, test must be applied. The first inquiry under that test is whether appellant was denied some requisite item of notice. Certainly the name of the person from whom remuneration was received or promised is an important fact in the case. The grand jury could not have found probable cause to indict appellant absent a showing that *some person,* whether known or unknown to the grand jurors, offered or gave remuneration to appellant. It is difficult to imagine how the State could have proved remuneration without establishing that a particular individual promised or provided it to appellant.

Though no case *precisely on point* commanded the State to provide the name requested by appellant, the issue raised by the motion to quash was a close and serious one. While not of precedential value, we note in addition that all three Texas form books dealing with criminal charging instruments contained, at the time of trial, sample indictments for V.T.C.A. Penal Code, Sec. 19.03(a)(3), capital murder, and that each one of the sample forms provided the name of the person promising or providing remuneration. See Branch's Texas Annotated Penal Statutes (3rd Edition 1977); McClung's Jury Charges For Texas Criminal Statutes (Indictments and Informations) (1981); Morrison and Blackwell's Criminal Forms (8th Ed.1974).

■ Under these circumstances, we find that appellant was deprived of a requisite item of notice by the State's failure to include the name of the person providing the remuneration in the indictment. The trial court erred by overruling appellant's motion to quash. See also *Rougeau v. State,* 738 S.W.2d 651 (Tex.Cr.App.1987). Thus, the first inquiry under *Adams,* supra, is satisfied.

In order to prove reversible error, appellant must show that, in the context of his case, the omission of the requested information had an impact on his ability to prepare a defense. We will review the record to determine whether harm was incurred.

The State argues that appellant had notice of the party offering remuneration even though such notice was not provided

---

**5.** This decision was delivered a year and one-half after the same writer's decision in *Brasfield,* supra, on rehearing.

in the indictment. In support of this assertion, the State directs our attention to the contents of the confession, which show that appellant knew the source of the remuneration, and the State's testimony that appellant had access to the State's files prior to trial. In its brief, the State argues:

"The State points out that in the present case the appellant's confession reveals that Walt Waldhauser recruited and helped the appellant murder the Wanstrath family and that Mark Duff Smith was behind it (R. IV–722). Counsel for the appellant knew that Duff–Smith and Waldhauser were co-defendants of the appellant (R. II– 322, 323). Counsel for the appellant had seen the State's file or substantial portions thereof (R. II– 22, 23, 31). During the course of the pre-trial motions for discovery it was established that the appellant had told Karen Holder (Janecka) that Mark Duff–Smith was paying to have it all done (R. XIV–65), and that Karen had told Detective McAnulty that Mark Duff–Smith was behind it (R. XIV– 123, 124) ...."

Turning to the facts of the instant case, we find that the only witness called by the defense at the guilt-innocence stage was John Holmes, District Attorney of Harris County. His testimony related to the standard warnings given to suspects by City of Houston police officers.

During the State's case in chief, when evidence relevant to remuneration was presented, appellant did not claim surprise, did not object on any ground related to the pretrial motion to quash, or even suggest that he was in any manner harmed.

Virtually the entire final argument by the defense was devoted to a discussion of the admissibility of various items of evidence, primarily appellant's confessions. Defense counsel never went beyond the general statement that absent the confessions, the evidence was insufficient.

It appears that the indictment's failure to name the party who remunerated or promised remuneration to the appellant in no way figured into the appellant's defense at trial. Appellant's only position at guilt-innocence was that his confessions were im-

properly admitted into evidence and that, absent the confessions, the evidence against him was generally insufficient. The issue of the indictment's failure to name the remunerating party was not raised in a motion for new trial. As the record stands, appellant's ability to prepare a defense was not affected by the trial court's admittedly improper refusal to grant his motion to quash. Since the record, when viewed in the context of the case, fails to show that the deficiencies in the indictment had any clear impact, the second requirement of the *Adams* test is not met. See also *Rougeau*, supra. Appellant's first point of error is overruled.

In a related point of error, appellant complains that his motion to quash the indictment for failure to specify the date on which the remuneration or offer to remunerate was made was improperly denied.

The State could have proved remuneration without establishing the exact date of that remuneration, other than to show that the offer of remuneration or the remuneration itself preceded the actual killing of the victim. Further, the State would not have been bound to prove any date specified in the indictment other than to establish that the crime was committed within the period of limitations. A prosecution for murder is not barred by any statute of limitations. Thus the date on which the remuneration or offer of remuneration was made does not impinge upon preparation of an adequate defense in the same manner that the name of the party offering remuneration does, since the latter allegation must be proven by the State.

While the date on which the offer of remuneration was made might arguably constitute "specificity as to facts establishing an element of the offense," requiring it of the State in the charging instrument is asking for something that is essentially evidentiary in nature. This point of error is overruled.

In his second point of error, appellant contends that his arrest was illegal based on federal law because of insufficiencies in

the arrest warrant and supporting affidavit.

The record reflects that officers involved in the investigation of Kevin Wanstrath's death obtained two separate warrants for appellant's arrest. One arrest warrant, based upon the affidavit of Houston Police Department Homicide Detective Dan McAnulty, was for the murder of Keith Farmer. This murder was totally unrelated to the Wanstrath case. The other arrest warrant, based upon the affidavit of Detective Johnny Bonds, was for arson against a habitation owned by Debra Waldhauser. Debra Waldhauser was the wife of Walter Waldhauser, an alleged participant in the Wanstrath murder.

Appellant was arrested pursuant to the murder warrant. Bonds, who participated in appellant's arrest, had the arson warrant in his pocket during the arrest but did not utilize it. After a hearing outside the jury's presence, the trial court ruled that the murder warrant issued and served on the appellant was invalid due to untrue statements in the supporting affidavit, and that the warrant could not be used to justify appellant's arrest. The court held, however, that the arson warrant was valid and that it could be used to support appellant's arrest since the arresting officers were aware of the warrant and had it with them.

Appellant makes three arguments under the point of error: (1) the arrest was invalid under *Madden v. State*, 644 S.W.2d 735 (Tex.Cr.App.1983), because the arson warrant was never executed; (2) the affidavit supporting the arson warrant was insufficient because it contained no information supplementing the bare allegation that the offense was committed within the period of limitation; and (3) the affidavit supporting the arson warrant was insufficient because it did not, under general federal law, establish probable cause to arrest appellant.

*Madden*, supra, is clearly distinguishable from the instant case. In *Madden*, officers arrested the defendant under an invalid warrant. The State sought to justify the arrest on the basis of an indictment and a capias issued against the accused and extant at the time of his arrest. We held that the arrest was not validated by the existence of the capias and indictment since the arresting officer had no knowledge of the capias and indictment, and no command to arrest the defendant based upon the capias or indictment had ever been communicated to him.

In the present case, by way of contrast, Detective Bonds was fully aware of the arson warrant, having prepared the affidavit in support of it and carried it to the arrest scene.

Thus, even assuming that *Madden*, supra, has survived our opinion in *Townsley v. State*, 652 S.W.2d 791 (Tex.Cr.App.1983), which held that the subjective intent of the arresting officer as to whether probable cause to arrest exists is irrelevant if such probable cause objectively exists, *Madden* does not control in the instant fact situation.

The arson arrest warrant, assuming it was otherwise valid, provided authority for the abridgement of appellant's personal liberty. The officer who arrested appellant knew of the warrant's existence, knew the facts supporting issuance of the warrant, and had the warrant with him when he arrested the appellant. Any technical irregularities resulting from failure to actually execute the arson warrant are not significant enough to activate the exclusionary remedy of Art. 38.23, V.A.C.C.P. See *Jones v. State*, 568 S.W.2d 847 (Tex.Cr.App.1978).

The affidavit in support of the arson arrest warrant proclaimed that the offense occurred on or about November 23, 1978. Appellant complains that no facts delineated in the affidavit established that the offense indeed occurred on that date.

An affidavit or complaint made before a magistrate and charging the commission of an offense must state the time and place of the commission of the offense, as definitely as can be done by the affiant. Art. 15.-05(3), V.A.C.C.P.

On the other hand, it is well established that an affidavit or complaint in support of an arrest warrant need not contain the same particularity required of an indict-

ment. *Vallejo v. State,* 408 S.W.2d 113 (Tex.Cr.App.1966). Nor is the information in such an affidavit required to match in quality or quantity the evidence necessary to obtain a conviction.

■ Moreover, this Court has on occasion expressed its preference, a preference shared by the legislature, for utilization of the warrant process on the part of police officers. *Lopez v. State,* 535 S.W.2d 643 (Tex.Cr.App.1976). Accordingly, we view arrest and search warrant affidavits in a common sense, not a hypertechnical fashion. *Frazier v. State,* 480 S.W.2d 375 (Tex. Cr.App.1972).

■ Assuming that the affidavit in support of the arson warrant established, in general, probable cause to arrest appellant for arson, it established probable cause to arrest appellant for the commission of an offense. No declaration or statement of supporting fact established an impossible date, that is, a date subsequent to the date on which the affidavit was sworn to or a date so remote that it placed the offense outside the statutory limitation period. Under these circumstances we find that the affidavit was not insufficient for failure to provide specific facts supporting the conclusory assertion as to the date of the alleged arson.

■ Finally, under this point of error, appellant challenges the trial court's finding that the affidavit supporting the arson arrest warrant established probable cause, in general, to arrest him.

The affidavit states in pertinent part as follows:

"Comes Now, J.L. BONDS, a Detective employed by the Houston Police Department, hereafter styled the Affiant and complains of a felony offense, and offenses and he states upon his oath that he has good reason to believe and does believe that in Harris County, Texas, ALLEN WAYNE JANECKA who is described as a white male born November 3, 1949, who is about 6 feet tall is slender built has blond hair and green eyes, hereafter called the suspect, on or about November 23, 1978, did then and there commit the offense of Arson to-wit he did unlawfully, start a fire with the intent to damage and destroy a habitation owned by DEBRA KAY WALDHAUSER, without her effective consent and or, in the alternative, commit arson by burning the same said habitation with intent to collect insurance to be paid by REPUBLIC INSURANCE COMPANY; and that the same said: ALLEN WAYNE JANECKA did on or about November 23, 1978 in Harris County, Texas enter a habitation owned by DEBRA KAY WALDHAUSER without her effective consent with the intent to commit theft and with the intent to commit arson and thereby commit the felony offense of Burglary.

"Your Affiant's belief is supported by probable cause based upon the following good and sufficient facts:

During the first or second week of October 1980, your affiant spoke to an informant, whose name will be with held for his protection, who told your Affiant that WALTER A. WALDHAUSER had arranged for a fire to be set in his apartment so that he could collect insurance money. The informant told your Affiant that he learned this information by virtue of a spoken admission of a party to the fraud. The informant said that the same party identified the person who started the fire as 'ALLEN.'

"Your Affiant believes the informant to be credible and his information reliable by virtue of the fact that the informer is a long time resident of Harris County, Texas and has no criminal history on file with the Texas Department of Public Safety, and is reputably employed.

"Your Affiant obtained a copy of Houston Fire Department—Arson squad report number 781552 which details an investigation following a fire at 1201 Wilcrest # 194 in Houston, Harris County, Texas, said to have been occupied by Walter and Debra Waldhauser. The report, which was verified by speaking to arson investigator Johnny Thornton, showed the fire to have had an incendiary origin and to have burned a portion of the apartment.

"Your Affiant next confronted, a person he knows to be, DEBRA WALDHAUSER with the arson on October 30, 1980. Mrs. Waldhauser admitted prior knowledge that a fire would occur during the Thanksgiving holidays.

"Again on November 13, 1980, your Affiant contacted DEBRA WALDHAUSER, this time armed with the information that the District Attorney's Office of Harris County would ask the 174th District Court Grand Jury to investigate the allegations of arson in said cause.

"Mrs. Waldhauser consented to and did provide a statement wherein she admitted overhearing a conversation between her husband and the suspect who she knows on sight, wherein the suspect admitted having set the fire in order for WALTER WALDHAUSER to collect money from his insurer. Mrs. Waldhauser also said that a 'hope chest' which was in the apartment before the fire and was neither burned during the fire or removed thereafter was later seen by her in the possession of the suspect.

"Your Affiant consulted the records of the Texas Department of Corrections and found that the suspect had been finally convicted of the offense of burglary in 1972 in Colorado County, Texas and thereafter was finally convicted in Harris County, Texas for burglary in 1975 and that this offense was committed after having been finally convicted on the two previous occasions and charged that the suspect is a habitual criminal."

We will determine whether the affidavit provided probable cause to arrest appellant under the "totality of the circumstances" test established for issues under federal law by the United States Supreme Court in *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), and adopted by this Court for such issues in *Whaley v. State*, 686 S.W.2d 950 (Tex.Cr.App.1985), and *Hennessy v. State*, 660 S.W.2d 87 (Tex. Cr.App.1983).

The unnamed informant's credibility was purportedly shown, "by virtue of the fact that the informer is a long-time resident of Harris County, Texas and has no criminal history on file with the Texas Department of Public Safety, and is reputably employed."

This background information on the unnamed informant's credibility skirts the perimeters of minimal sufficiency discussed in cases such as *Wood v. State*, 573 S.W.2d 207 (Tex.Cr.App.1978), *Avery v. State*, 545 S.W.2d 803 (Tex.Cr.App.1977), and *Carvajal v. State*, 529 S.W.2d 517 (Tex.Cr.App. 1975). Those cases hold that a minimally sufficient showing of unnamed informant credibility requires a recitation in the affidavit that the informant has no criminal record and enjoys a good reputation among his associates and in the community.

The affidavit here recites that the informer: (1) is a long-time resident of Harris County; (2) with no criminal record; and is (3) reputably employed. The specification of "reputable" employment arguably supplies some of the indicia of good reputation required by cases such as *Avery*, supra,

The basis of the unnamed informant's knowledge was a spoken admission by a party to the "fraud," that is, the setting on fire of Waldhauser's apartment so that Waldhauser could collect insurance money.

The party to the fraud, in addition to outlining the fraudulent scheme, stated that "Allen" started the fire. It is not clear from the affidavit how the unnamed informant learned that the party to the fraud was indeed a party to the fraud. Though it can be inferred that the party to the fraud admitted to being such, this is not specifically stated in the affidavit.

Any statement by a source which includes an admission of wrongdoing gives some indication that the source is credible. Even if the admission by the party to the fraud was an admission against interest, it is not exactly clear how the party knew that "Allen" started the fire. Presumably he either met with "Allen," aided him in starting the fire, or heard of "Allen's" involvement from other parties.

Houston Fire Department records, buttressed by arson investigator Thornton, confirmed that a residence occupied by Walter and Debra Waldhauser suffered

fire damage and that the fire had an "incendiary origin."

Debra Waldhauser admitted to the affiant prior knowledge that a fire would occur at her residence over the Thanksgiving holidays. When Debra Waldhauser was informed by the affiant that a grand jury was investigating the allegations of arson, she provided more information.

Debra Waldhauser stated that she overheard a conversation between her husband and appellant, wherein appellant admitted having set the fire in order for Walter Waldhauser to collect insurance money. Debra Waldhauser also stated that she saw a hope chest that was in the apartment *before* the fire, in the possession of appellant *after* the fire.

Debra Waldhauser's status as a named informer goes a long way towards establishing her credibility. See *Woods v. State,* 533 S.W.2d 16 (Tex.Cr.App.1976). It is clear from examining the affidavit, however, that she was not a classic citizen-informer. Though nothing in the affidavit establishes that Debra Waldhauser was guilty as a party to the apparently fraudulent arson scheme, it is clear that she gave information under pressure of official investigation into the matter. The information she gave can either be seen as an admission of sorts by a person implicated in the scheme or as an effort by an implicated party to receive lenient treatment by foisting responsibility on another.

The basis of Debra Waldhauser's knowledge of the information she provided was clear; an admission by the alleged arsonist and direct observation of an item in the alleged arsonist's possession.

The affidavit finally provided the information that appellant had been twice convicted of burglary. The criminal record of a suspect can be taken into account when making a probable cause determination. See *United States v. Harris,* 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971). See also *Woodward v. State,* 668 S.W.2d 337 (Tex.Cr.App.1984).

It is evident from the above analysis that some of the sources of information relied upon by Detective Bonds in his effort to establish probable cause were partially flawed in terms of inherent credibility and basis of knowledge. But the question to ask under *Illinois v. Gates,* supra, and other relevant case law, is whether the magistrate was presented with facts from which he could make an informed and independent judgment as to whether probable cause existed and whether there was a substantial basis for the magistrate's ruling that probable cause did exist.

While the information from the unnamed informant alone would not have established probable cause, and the information from Debra Waldhauser alone might not have established probable cause, these two sources together with the fire department records and appellant's criminal background combined to produce a substantial basis for the magistrate's finding of probable cause under the test established in *Illinois v. Gates,* supra, and *Whaley,* supra. Accordingly, appellant's point of error is overruled.

In points of error three and four appellant complains that his recorded oral confession and his subsequent written confession were improperly admitted into evidence in violation of his Fifth and Sixth Amendment rights to counsel.

Appellant was arrested on the evening of November 23, 1980. He signed an exculpatory written statement in the early morning hours of November 24, 1980.

On November 25, 1980, appellant was taken to the 177th District Court for purposes of a hearing on the Keith Farmer murder. At that hearing the court appointed attorney Philip Scardino to represent appellant.

After brief consultation with his client, Scardino spoke to Detective Bonds who informed Scardino that he anticipated a three-count capital murder charge would be brought against the appellant for the murder of 14-month-old Kevin Wanstrath and his parents John and Diana Wanstrath.

Scardino asked Detective Bonds not to place appellant in a show-up or lineup or to interrogate appellant without first contact-

ing Scardino. Detective Bonds agreed to this arrangement.

On November 26, 1980, McAnulty, who had been informed of the agreement between Scardino and Detective Bonds, called Scardino and told him that a lineup would be held at noon on November 28, 1980. Scardino promised to be there. McAnulty had recently returned from a trip to Georgia where he obtained significant information connecting appellant to the Wanstrath murders.

In an "Offense Report Supplement" that he prepared on November 28, McAnulty set out what happened on that day. The supplement was introduced at the pretrial hearing, and McAnulty testified that it accurately reflected the sequence of events surrounding the planned lineup:

"...

"Detective Uresti checked Allen Janecka out of jail at 12:25 PM and brought him to the Homicide office where he was seated in the third West office from the Captain's office. The witness in the Farmer Murder case had arrived and we were waiting for Philip Scardino to arrive. Ass't D.A. Eggleston had also come in for the show-up and after waiting until about 2:00 PM for Scardino to arrive, it was decided not to have the showup. The witness was taken back to the airport to go back to San Antonio. We were not able to get in touch with Scardino.

"About 2:15 PM, Detective McAnulty and Uresti advised Janecka that the show-up had been cancelled and told him we were going back upstairs to the jail. This was the first time I had seen Janecka personally. Just before this, Janecka overheard another officer ask me something about my having been to Georgia. "As we prepared to leave the Homicide office, Janecka asked me how everyone in Georgia was doing. At this point I introduced myself to him by name and told him that everyone I saw was fine. I told Janecka that I had talked with several persons there who knew of his involvement in this case and that I had brought back the pistol that Karen [appellant's common-law wife] had and it had been matched with a slug recovered in the shootings.

"I also told Allen he should tell the truth about what had happened. At this time Allen began to cry as we were just stepping out of the elevator to the fifth floor. We had come straight from the Homicide Division and our conversation occurred while we were walking down the hall to the elevator and the ride up two floors which took only a couple of minutes. "When Allen began to cry, I asked him if he wanted to talk to me about this case. He said he did. I told him that we had already tried to call his lawyer to come to the showup and I did not know how to reach him right now. Allen stated he didn't care and he didn't want his lawyer there right now. I told Allen I would place him back in the jail and go and talk to the Ass't D.A. and if he said it was all right to talk I would come back."

After returning appellant to jail, McAnulty asked an Assistant District Attorney if he could speak with the appellant without appellant's lawyer present. McAnulty was advised that it was proper to talk with appellant if appellant wanted to waive his right to have an attorney present.

About 2:50 p.m. McAnulty brought appellant back to the homicide division and gave him the statutory warnings required by Art. 38.22, V.A.C.C.P. McAnulty reminded appellant that he already had an appointed attorney, "and if he didn't want to discuss anything with me he certainly didn't have to and he could wait until some other time."

Appellant responded to the effect that he had been to the penitentiary twice, definitely understood his rights and desired to waive them.

McAnulty asked appellant if he could tape record their conversation. Appellant agreed but did not want the recorder turned on immediately.

Appellant confessed in "bits and pieces" to killing the Wanstraths and at times broke down and cried, expressing his sorrow.

After a while, appellant spoke in more detail and with some composure. McAnulty asked if he could turn the recorder on and appellant agreed. McAnulty once more gave appellant the required statutory warnings. Appellant then made a full confession on tape. An edited version of the tape was admitted into evidence against appellant at trial.

On the morning of November 29th at 7:35 a.m. the appellant was again checked out of jail and given his warnings. The appellant stated that he understood his rights and wanted to waive them and talk to McAnulty. The appellant made a written confession which McAnulty typed and which was introduced at trial with some deletions.

These points of error raise important questions. Had appellant's Fifth and Sixth Amendment rights to counsel been properly invoked when McAnulty took his confession? Under what circumstances can an attorney speak for his client by invoking the client's right to have an attorney present during questioning? Did appellant effectively waive his rights before McAnulty questioned him?

This case implicates appellant's Fifth and Sixth Amendment rights to counsel. The Fifth Amendment right to counsel is designed to help secure the constitutional privilege against compulsory self-incrimination. See *Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977). The Sixth Amendment right to counsel means at the least that a person is entitled to the help of a lawyer at or after the time that judicial proceedings have been initiated against him, whether by way of formal charge, preliminary hearing, indictment, information, or arraignment. *Kirby v. Illinois*, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972).

■■■ The State concedes that appellant's Sixth Amendment right to counsel was in force at the time of his confession, *but only with respect to the Rick Farmer murder case.* Under this theory, since Scardino had not been appointed to represent appellant in any of the Wanstrath cases, and appellant had not been charged

with the Wanstrath murders, appellant's Sixth Amendment right to counsel had not attached in relation to the Wanstrath case.

Given the facts of the instant case, we must reject the State's contention. Clearly the State acted as if Scardino represented appellant for all purposes. Though police officers were pursuing the Farmer case, their main objective remained connecting appellant to the Wanstrath killings. The record from both the pretrial hearing and trial makes clear that the Farmer case was being utilized by the police in order to hold appellant while new information was obtained concerning the Wanstrath murders. Detective Bonds told Scardino that he expected a three-count indictment to be shortly presented against appellant in the Wanstrath case, and it was in the context of this discussion that an agreement was made not to question appellant in the attorney's absence.

In these circumstances it would be unrealistic to hold that appellant's Sixth Amendment right to counsel had not yet attached vis-a-vis the Wanstrath case, and we decline to do so. For an example of a similar holding in the Fifth Amendment context see *Evans v. State*, 659 S.W.2d 405 (Tex.Cr.App.1983).

The State also maintains that appellant's *Fifth* Amendment right to counsel could not be invoked by Scardino because he only represented appellant in the Farmer case. This argument must fail generally for the same reasons that it failed in the Sixth Amendment context. Additionally, we note that the Fifth Amendment right to counsel does not attach only after judicial proceedings have been initiated against an accused. It can be invoked at any time by an accused in custody who wants to forestall questioning until his lawyer is present. It is particularly relevant in this regard that Scardino told Detective Bonds not to interrogate appellant absent counsel *just after Bonds had informed Scardino that a three-count indictment against appellant was expected in the Wanstrath case.* It would then be the ultimate in elevating form over substance to hold that Scardino only represented appellant in the Farmer case and

only requested to be present for lineups and interrogations in the Farmer case.

The State contends and the trial court held that the Fifth Amendment right to counsel is personal to the accused and cannot be invoked by his attorney.

Undoubtedly, the Fifth Amendment right to counsel is a right that is personal to the accused. Under certain circumstances, however, an accused's attorney can speak for the accused in invoking Fifth Amendment protections. Cases such as *Wilkerson v. State*, 657 S.W.2d 784 (Tex.Cr.App.1983), *Phifer v. State*, 651 S.W.2d 774 (Tex.Cr.App.1983), *Stone v. State*, 612 S.W.2d 542 (Tex.Cr.App.1981), and *Williams v. State*, 566 S.W.2d 919 (Tex.Cr.App.1978), teach that an attorney can speak for his client in invoking the Fifth Amendment right to counsel if: (1) the attorney-client relationship exists; (2) the attorney invokes the Fifth Amendment right to counsel in the presence of the accused or after conferring with the accused; (3) the accused does nothing to contradict his attorney; and (4) officers agree not to question the accused in the attorney's absence.[6]

Attorney Scardino satisfied each of the above requirements. He was appointed by the trial court to represent the accused, conferred briefly with the accused, asked Detective Bonds in the accused's presence without contradiction by the accused not to question the accused in counsel's absence, and received assurance from Detective Bond that officers would not question appellant absent counsel. Thus, when appellant was taken out of jail for a lineup on November 28th he had already effectively invoked his Fifth Amendment right to counsel. Under *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), and *Oregon v. Bradshaw*, 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983), he could not be questioned or interrogated concerning the Wanstrath killing unless he

first initiated further communication, exchanges, or conversations with the police regarding that killing *and* knowingly and voluntarily waived his right to counsel judged by the totality of the circumstances.

Turning again to the events of November 28th, we hold that the fellow officer's[7] question to *McAnulty* asking how *McAnulty's* trip to Georgia had been did not amount to police interrogation of *appellant*.

In *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), the Supreme Court defined "interrogation" for purposes of the Fifth Amendment as follows:

> "We conclude that the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect...." 446 U.S. at 300–301 [100 S.Ct. at 1689].

In *Innis*, supra, police officers arrested a man suspected of killing one cab driver with a sawed-off shotgun and robbing another driver with the same gun. The two officers who transported Innis to the police station engaged each other in a brief conversation about a school for handicapped children in the area and the possibility that a handicapped child might find a weapon with shells and hurt himself. Innis then showed the officers where he had hidden the sawed-off shotgun.

The Supreme Court held that the apparently offhand remarks of the officers did not constitute interrogation. They did not engage in a lengthy harangue and nothing

---

6. Our opinions in the past have sometimes focused on the agreement of police officers not to question a suspect in his attorney's absence. If an accused, or an attorney speaking for the accused, has stated a desire to talk to the police only in the presence of counsel, that request must be honored whether or not police officers agree.

7. The fellow officer or detective was not identified by name and did not testify at trial.

in the record suggested that their remarks were designed to elicit a response.

The remark in the instant case was even more innocuous than that in *Innis,* supra. The offhand question came from another officer, apparently uninvolved in the case. Nothing in the record remotely suggests that the comment was designed to elicit a response from appellant or directed in any manner at appellant.

Nor do we believe that the remark addressed to McAnulty constituted interrogation under the Sixth Amendment, assuming there is a difference between Fifth and Sixth Amendment interrogation.

■ Since the remark to McAnulty was not interrogation, the next issue is whether appellant's question, "How is everyone in Georgia doing?," was an initiation of further communication, exchanges, or conversations under *Edwards,* supra. In *Bradshaw,* supra, the Supreme Court defined, for purposes of *Edwards* analysis, the term "initiation" as follows: *an inquiry representing a desire on the part of an accused to open up a more generalized discussion relating directly or indirectly to the investigation.*

The record reveals that appellant had been living in Georgia prior to being arrested on a visit to Houston. The record further reflects that appellant left the Wanstrath murder weapon in Georgia with his common-law wife and her sister and that his wife was aware of his involvement in the Wanstrath case. Appellant knew the police were actively investigating his role in the Wanstrath slayings and moments before his statement discovered that a detective involved in the scheduled lineup had just returned from Georgia. Clearly, then, the question, "How is everyone in Georgia doing?" reflected a desire on the part of appellant to open up a more generalized discussion relating directly or indirectly to the investigation. This seems far more true of appellant's statement than the statement held to be an "initiation" in *Bradshaw,* supra: "Well, what is going to happen to me now?"

■ Undoubtedly, McAnulty's immediate response to appellant constituted interrogation or its functional equivalent. McAnulty informed appellant of all the damaging evidence against him and asked, "Why don't you tell the truth?". As noted earlier, appellant then cried and stated that he wanted to talk about the Wanstrath killings. McAnulty reminded appellant that he had a lawyer and appellant responded that he did not need one. Appellant was then put back in his jail cell for half an hour and warned three more times of his right to have counsel present before making a taped oral confession. Prior to the confession appellant told McAnulty that he understood his rights, having been to the penitentiary twice, and desired to waive his right to counsel.

Since we have already determined that appellant initiated a conversation with McAnulty *before* McAnulty interrogated him, we must next decide whether appellant also waived his Fifth Amendment right to counsel prior to being interrogated by McAnulty.

Waiver is the "intentional relinquishment or abandonment of a known right or privilege." *Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938).

*Bradshaw,* supra, makes clear that the question whether a suspect initiates a conversation with the police and the question whether he has waived the Fifth Amendment right to counsel are separate issues calling for separate analyses. Nevertheless, the analyses are not mutually exclusive.

*Bradshaw,* supra, and *Edwards,* supra, hold that the waiver of counsel should be knowing and voluntary under the totality of the circumstances *including the necessary fact that the accused, not the police, reopened the dialogue with the authorities* and *including the background, experience and conduct of the accused.*

In the instant case, appellant reinitiated conversation with the police. His background and experience, which he specifically adverted to in saying that he did not need a lawyer, were such that he was quite familiar with his constitutional rights to

counsel. Finally, he specifically waived his right to counsel seconds after McAnulty's interrogating question and twice more within the next hour. The foregoing leads us to conclude that appellant had waived his right to counsel when McAnulty asked him to "tell the truth," despite the lack of an explicit oral or written waiver between the time of appellant's reinitiation of questioning and McAnulty's first statement to appellant.

We also hold that appellant waived his Sixth Amendment right to counsel before being interrogated by McAnulty. Under the facts of the instant case we see no distinction between Fifth and Sixth Amendment waiver analyses, except for that necessitated by the prophylactic requirements of *Edwards*, supra, and *Bradshaw*, supra. Appellant's third and fourth points of error are overruled.

In his fifth point of error, appellant complains that the trial court erred in failing to sustain his motion to suppress evidence derived from a trespass of the victim's residence. Appellant has no standing to complain of an illegal search of another's residence. *Phariss v. State*, 131 S.W.2d 965 (Tex.Cr.App.1939). See also *Jenkins v. State*, 299 S.W. 642 (Tex.Cr. App.1927).

In his sixth point of error, appellant contends that the trial court erred in failing to sustain his motion to suppress evidence derived from the appellant's oral confession on November 28. This point of error is based on the assumption that the oral confession was improperly admitted into evidence, a position we rejected in appellant's third point of error. Accordingly, appellant's sixth point of error is overruled.

In his eighth point of error, appellant contends that when the evidence improperly admitted as a result of Fourth, Fifth, and Sixth Amendment violations is removed from consideration the remaining evidence is insufficient to support a conviction for capital murder.

We have already held that the evidence appellant contends was inadmissible was in fact admissible. We also note our long-standing policy of refusing to consider sufficiency claims based on evidence remaining after improperly admitted evidence is removed from consideration. See *Porier v. State*, 662 S.W.2d 602 (Tex.Cr.App.1984). Appellant's eighth point of error is overruled.

In his ninth point of error, appellant complains of the trial court's refusal to include a definition of the elements of the offense of trespass in the charge to the jury.

Since appellant had no standing as a matter of law to complain of any trespass of the victim's residence, the issue of whether a trespass occurred was totally irrelevant to the case. Appellant's ninth point of error is overruled.

In his seventh point of error, appellant maintains that the trial court improperly denied him the opportunity to impeach a witness by showing the witness' bias.

Debra Waldhauser testified that appellant set a portion of her apartment on fire as part of a scheme, involving appellant, Debra Waldhauser, and Walter Waldhauser, to collect insurance money. Appellant sought to introduce details of the plea bargain agreement reached in the Wanstrath case and related cases between prosecutors and Walter Waldhauser. Appellant's theory was that Walter Waldhauser stood to gain by testifying for the State and against appellant; ergo, his wife had a common interest in giving similar testimony and in not contradicting the State.

It has long been the rule that great latitude should be allowed the accused in showing a witness' possible bias, prejudice, or motive to falsify his testimony. *Cloud v. State*, 567 S.W.2d 801 (Tex.Cr.App.1978). Equally axiomatic is the trial court's wide discretion in determining how and when bias may be proven and whether purported evidence of bias is material. *Chvojka v. State*, 582 S.W.2d 828 (Tex.Cr.App.1979). Further, at least in some situations, a defendant has the burden of showing the relevance of particular evidence to the issue of bias or possible bias. *Garza v. State*, 532 S.W.2d 624 (Tex.Cr.App.1976).

In the instant case appellant made no attempt to show whether *Debra Waldhauser* was influenced by any plea bargain agreement between her husband and the State. Appellant did not show that there was any arrangement for Walter Waldhauser to give testimony *in the instant case*, and in fact Waldhauser gave no such testimony. Of most importance, appellant made no effort to show why Debra Waldhauser's interests would dovetail with those of her husband.

Arguably the result might be different in this case if the evidence established merely that Debra Waldhauser was Mr. Waldhauser's wife. But the undisputed evidence from both sides was that Mr. and Mrs. Waldhauser were in the process of obtaining a divorce and were hostile to one another. In fact, under cross-examination Mrs. Waldhauser admitted that she did not reveal the scheme to set her apartment on fire to the police until she began having marital difficulties with her husband.

Under these circumstances it was incumbent upon appellant to make some effort to show why Mr. and Mrs. Waldhauser's interests coincided before presenting testimony relative only to Mr. Waldhauser's plea bargain. Based upon the facts of this case, appellant's seventh point of error is overruled.

In his tenth point of error, appellant contends that the trial court improperly refused to excuse venireman George Larsen for inability to consider the full range of punishment. See Art. 35.16(c)(2), V.A.C.C.P.

In the course of its examination of Larsen the State meticulously explained the first two special punishment issues under Art. 37.071(b). Larsen unequivocally stated that he would answer the questions either "yes" or "no" based solely on the evidence.

During examination by the defense, the following exchange occurred between defense counsel and Larsen:

"Q. Concerning the death penalty, as we told you earlier, there's only certain circumstances in which the death penalty is an appropriate punishment. That's in a capital murder situation. Capital murder is a little bit different from murder. In a murder case, that's where someone intentionally and knowingly killed someone.

"A capital murder situation where you have murder but it occurred during the course of robbery, rape, killing a police officer, killing during a prison breakout or killing during arson or murder for hire. Those are the only circumstances in which the death penalty is an appropriate punishment.

"Do you feel like you understand the distinction between just a murder case and a capital murder case?

"A. Yes.

"Q. Okay. Now, let's assume that you're a juror in the case. And you have found the defendant guilty of a murder for hire. You have found he has killed someone for remuneration, for money, or the promise of money.

"Okay?

"A. (Nods head affirmatively.)

"Q. And now, it's the punishment phase of the trial. Do you feel like you could consider a life punishment?

"A. I don't think so, not if it lays out just like you said.

"THE COURT: Let me ask you this: Would you consider all the facts and circumstances surrounding the case in making your determination or would you automatically vote yes, because you think that's the appropriate punishment? Or would you let the facts and circumstances dictate to you what you thought?

"A. The facts would have to dictate to me."

Appellant moved to strike Larsen, but the trial court overruled the motion. Later, after examination of Larsen on other topics, appellant again moved to strike Larsen, "for cause because the juror said he could not consider life imprisonment as a punishment for capital punishment."

The following exchange then took place between the trial court and Larsen:

"THE COURT: I don't believe that's what he said. You were asked about, basically, what your preference was or how you would rule or what kind of verdict you would give as to capital murder. You understand you can't give a verdict of saying life or death, so you don't have a choice of preference there.

"You understand that?

"THE JUROR: Yes, sir.

"THE COURT: So, you understand you have to answer the two questions. Would you listen to the evidence in regard to both of the two questions in arriving at what you think proper?

"THE JUROR: Yes, sir.

"THE COURT: Would you automatically vote one way or the other simply because you felt that was the result, or because that's what the evidence shows you?

"THE JUROR: I have to go to the evidence."

Appellant renewed his objection and the trial court again overruled it.

The foregoing exchanges quoted from the voir dire clearly show that Larsen was rehabilitated by the trial court. Appellant's reliance on *Cuevas v. State*, 575 S.W. 2d 543 (Tex.Cr.App.1979), and *Smith v. State*, 573 S.W.2d 763 (Tex.Cr.App.1978), is entirely misplaced. In those cases the challenged veniremen were thoroughly questioned as to whether they could consider life imprisonment for a defendant found guilty of capital murder. The veniremen repeatedly indicated that they would *not* consider life imprisonment in such a situation and evinced a strong conviction that death is the only appropriate punishment for one found guilty of capital murder. Under those circumstances, we held that the veniremen could not be rehabilitated by ritually reciting that they would "follow the evidence" in considering the special punishment issues.

The instant case presents an almost reversed set of facts. Here the venireman was thoroughly grounded in the mechanisms of the special punishment issues and the State's burden of proof on the special

issues and properly showed that he could follow the law. He then gave a brief response to an ambiguous question posited by defense counsel.

Defense counsel first explained that the death penalty is only "appropriate" under certain circumstances. Next, he stated that the death penalty was only "appropriate" for murder committed in the course of robbery, rape, killing a police officer, killing during a prison outbreak, or killing during arson or murder for hire. Finally he assumed the juror had found a defendant guilty of murder for hire and asked him if he could consider a life punishment. Larsen replied, "I don't think so, not if it [8] lays out just like you said."

Defense counsel moved to strike without any further effort to discover Larsen's true feelings as to capital punishment. The trial court painstakingly reviewed the capital murder punishment scheme for Larsen who once again indicated that he could fairly answer the punishment issues. It is absurd to contend that Larsen's voir dire was anything like the voir dires of the veniremen in *Cuevas*, supra, and *Smith*, supra. Appellant's tenth point of error is overruled.

In his fourteenth point of error, appellant complains that the trial court erred in excluding for cause venireman Mary E. Leonard without allowing examination by appellant. Leonard was excused because of her inability to assess the death penalty or answer the punishment issues affirmatively.

The State first determined that Leonard was opposed to the death penalty, had been opposed to it for several years, and could not assess it. The State asked if she could "ever see [herself] sitting on a case as a juror where the possible punishment for the defendant was death," and Leonard answered "No."

The State then explained the system whereby jurors do not actually assess the death penalty, but rather answer punish-

---

8. It is unclear whether "it" refers to the murder for hire fact situation or the circumstances un-

der which the death penalty is an "appropriate" punishment.

ment issues "yes" or "no" based on the evidence. Leonard stated that she would answer one of the questions "no" in order to keep an accused from receiving the death penalty. The State challenged her for cause.

The trial court took over questioning and explained the punishment issues. Leonard told the court, in response to questioning, that she would answer "no" even if the State met its burden beyond a reasonable doubt on the punishment questions; that she would always answer "no;" and that she would not set aside her feelings and follow the law. Leonard never wavered in her answers. The trial court excused her over appellant's objection.

The trial court erred in not granting the appellant's request to examine Leonard further. Such errors are not reversible when, as here, the record shows that the venireman was questioned at length and unequivocally stated that she could not vote for the death penalty under any circumstances. *White v. State*, 629 S.W.2d 701 (Tex.Cr.App.1982). Unlike appellant, we see no significant difference between this case and *White*, supra. His fourteenth point of error is overruled.

■ In points of error twelve and fifteen appellant complains of the following charge given at the punishment stage:

"YOU ARE NOT TO DISCUSS AMONG YOURSELVES HOW LONG THE DEFENDANT WOULD BE REQUIRED TO SERVE THE SENTENCE, IF ANY, THAT YOU IMPOSE. SUCH MATTERS COME WITHIN THE EXCLUSIVE JURISDICTION OF THE BOARD OF PARDONS AND PAROLES AND THE GOVERNOR OF TEXAS, AND ARE OF NO CONCERN TO YOU."

Appellant first objects that the charge as a whole was improper and should not have been given. We rejected a similar contention in *Williams v. State*, 668 S.W.2d 692 (Tex.Cr.App.1983).

Appellant also complains that the jury was not told not to *consider* how long the defendant would be required to serve, but instead was merely told not to *discuss* it.

Contrary to appellant's assertion in his brief, this particular objection was never raised at trial. Further, though it would have been better to include the word "consider," the trial court's admonition not to "discuss among yourselves" the matters that "are of no concern to you" adequately conveyed to the jury that it was not to consider the question of parole. Points of error twelve and fifteen are overruled.

■ In his eleventh point of error, appellant contends that the trial court erred in conducting the jury selection pursuant to Art. 35.13, V.A.C.C.P., which purportedly violates the equal protection and due process clauses of the Texas and United States Constitutions.

Art. 35.13, supra, states:

"A juror in a capital case in which the state has made it known it will seek the death penalty, held to be qualified, shall be passed for acceptance or challenge first to the state and then to the defendant. Challenges to jurors are either peremptory or for cause."

Appellant argues that in non-capital cases, under authority of Arts. 35.25 and 35.26, V.A.C.C.P., the entire panel is interrogated before the parties make their peremptory challenges. This procedure provides an opportunity to assess the panel as a group and select the most desirable jurors after having heard the answers of all. In capital cases, however, the defendant must exercise peremptory challenges upon the examination of individual prospective jurors without the opportunity to evaluate the panel as a group. According to appellant, this procedure denies him the right that non-capital felony defendants enjoy to make a circumspect and sensible exercise of peremptory challenges after examination of the entire venire.

We summarily overruled an identical contention in *Granviel v. State*, 552 S.W.2d 107 (Tex.Cr.App.1976). In *Sanne v. State*, 609 S.W.2d 762 (Tex.Cr.App.1980), we "assumed without deciding" that this constitutional challenge was "not without merit," but held that the defendant had failed to show harm.

Appellant has preserved this point of error in the manner prescribed by this Court in *Sanne*, supra.

Appellant's attack boils down to this: capital defendants are discriminated against in relation to non-capital defendants as to the manner in which peremptory challenges to the venire are allowed. For purposes of the issue involved appellant is not a member of a suspect class and the discrimination allegedly involved does not implicate a fundamental right. If the statute at issue is rationally related to a legitimate state purpose it will therefore pass muster.

It is obvious that Art. 35.13, supra, on its face and in practice is beneficial to a capital defendant in ways that the other relevant statutes are not beneficial to non-capital felony defendants. A capital murder defendant examines the veniremen individually and in isolation. This generally allows for more detailed evaluation of a venireman and prevents a potential juror from being influenced by the responses of others. Capital defendants do not have to exercise a peremptory strike against a particular venireman until the State has first decided whether to do so. Thus, if the State and the defendant do not want a given venireman, and he cannot be excluded for cause, the defendant will benefit by saving one of his peremptory challenges.

Capital defendants are allowed fifteen peremptory strikes as opposed to ten for non-capital felony defendants.

It can readily be seen that in many respects capital murder defendants have advantages in jury selection not enjoyed by non-capital felony defendants. Incidental to the entire capital murder scheme, capital murder defendants apparently suffer a minor disadvantage not suffered by non-capital defendants, to wit—inability to use peremptory challenges after examining the entire venire. This does not alter the clear overall benefits enjoyed by capital defendants in jury selection. Further, at least one of those benefits, five extra peremptory strikes, can be said to counteract the disadvantage.

It has been a longstanding tenet of equal protection analysis, and to a lesser extent due process analysis, that legislatures should be free to make some classifications and discriminations in gradually dealing with societal issues. It should not be expected of any law that it instantly solve all of society's problems.

We find that the scheme for jury selection in capital murder cases is not violative of state or federal due process or equal protection. Appellant's eleventh point of error is overruled.

In his thirteenth point of error, appellant avers that the trial court erred in failing to grant appellant's challenge for cause of venireman Kay Plaisance upon a showing of her being the complaining witness in a pending rape case.

Appellant does not contend that the voir dire established Plaisance's prejudice, and he does not challenge the State's assertion that Plaisance was shown to be fair and impartial. Rather, appellant notes that a potential juror can be excluded for cause under Art. 35.16(a)(3), V.A.C.C.P., if he is under indictment or other legal accusation for theft or any felony. Appellant contends there should be similar automatic exclusion for all felony and theft complaining witnesses. The failure of Art. 35.16, supra, to so provide renders it, according to appellant, unconstitutional.

We note initially that appellant points to no juror actually excluded by the State under Art. 35.16(a)(3). Thus, it is doubtful if appellant has standing to raise the constitutionality of the provisions.

Nevertheless, we do not hesitate to hold the statute constitutional. The legislature obviously felt that the dangers of bias and conflict of interest were so great with respect to veniremen facing possible prison sentences that it erected a prophylactic rule automatically excluding them. It was reasonable and rational for the legislature to conclude that the inherent dangers of bias were not as great in the case of complaining witnesses. Complaining witnesses in other cases are not parties to a case. No matter how victimized they may feel by a crime perpetrated against them, they do

not face the possibility of a felony sentence. We will not sit in judgment as a superlegislature and hold that the choice made by the legislature in this instance was so irrational or arbitrary that it rendered the statute unconstitutional. Further, if it be shown that a complaining witness in a pending felony case cannot be impartial, he can of course be excluded for cause. Appellant's thirteenth point of error is overruled.

The judgment is affirmed.

McCORMICK, J., concurs in the result of Point of Error one, and joins the remainder of the opinion.

CLINTON, J., dissents to the disposition of Points of Error three, four, six, seven and ten; but joins the remainder of the opinion.

TEAGUE, Judge, dissenting.

This is a companion case to *Duff-Smith v. State*, 685 S.W.2d 26 (Tex.Cr.App.1985).

The facts here are just as shocking as those set out in *Duff-Smith*, supra.

There is no question from this record and the record of *Duff-Smith*, supra, that appellant and the others who conspired and participated in the murders of Gertrude Zabolio, Duff-Smith's mother, Diana Wanstrath, Duff-Smith's sister, Diana's husband, John, and their adopted baby Kevin were then persons of extremely low moral character, and each one then had a heart regardless of social duty and a mind fatally bent on mischief. How they became that way is, of course, a subject for other more skilled professionals to study, and not for members of this Court to decide.

Putting the two records together, the facts reflect that Duff-Smith solicited, encouraged or directed Walter Waldhauser to murder his mother, Gertrude Zabolio, so that he and his sister Diana and Diana's adopted child could then become the sole heirs of her estate. Waldhauser solicited Paul McDonald to commit the murder. McDonald, in turn, hired appellant, who actually strangled Duff-Smith's mother to death. Having accomplished that deed, Duff-Smith then decided to kill his sister,

Diana, her husband, John, and their adopted baby, Kevin, so that he could become the sole heir of Diana's estate. Waldhauser was again chosen by Duff-Smith to take care of the arrangements. Waldhauser solicited appellant to carry into execution Duff-Smith's desires. With Waldhauser assisting, inside of the Wanstrath's residence, appellant shot Diana, her husband, and their adopted baby, which caused their deaths. With the death of his mother, his sister, and her adopted baby, Duff-Smith then became a sole heir. His enjoyment of the proceeds from those estates, however, was only temporary due to extremely tenacious investigative work that led to the arrests of all the participants.

The question that this Court must answer in this cause is not how amoral or immoral appellant might have become, or how far he had fallen in his lifetime from being a good Catholic boy to a hired executioner, but, instead, is whether appellant was deprived of any of the many legal rights that our law guaranteed him before he could be lawfully convicted and sentenced to a premature death, and, if so, whether such deprivations rise to the level that would warrant this Court reversing his conviction and sentence of death. For reasons I will give, I find that appellant's conviction and sentence of death should be reversed by this Court.

After reading the discussion that is in the majority opinion that relates to appellant's first contention, that the trial court erred in not sustaining his pretrial motion to quash, I now realize that I inadvertently failed in the dissenting opinion that I filed in *Adams v. State*, 707 S.W.2d 900 (Tex.Cr.App.1986), to dub that opinion "Adams the Execrable", for that is exactly what it is. *Opdahl v. State*, 705 S.W.2d 697 (Tex.Cr.App.1986), which I authored for the Court, is merely the little stare-decisis bastard of "Adams the Execrable." Of course, because *Opdahl*, supra, lies within the bowels of "Adams the Execrable", once we kill off "Adams the Execrable," "The Little Bastard Opdahl's" death is assured. I find

that today is a fine day to kill off "Adams the Execrable." Let's do it! [1]

Because the majority declines my invitation, for this and other reasons, see *post*, I am compelled to dissent, but do so respectfully.

The majority opinion is simply wrong, wrong, wrong in continuing to give meaning to *Adams*, supra. There is absolutely no legal rhyme or reason, other than aggressiveness and assertiveness on the part of at least five members of this Court, why that decision of this Court should not be expressly overruled.

The most egregious thing wrong with *Adams*, supra, lies in the fact that, once it is determined that the State erred in not giving the defendant sufficient notice in the charging instrument, pretrial, this Court will, in making the determination whether the error was harmful, actually apply the presumption of guilt standard, when the determination should be decided on the basis of the presumption of innocence standard.

It is or should be axiomatic that questions of notice in the charging instrument are determined under the presumption of innocence standard, and not the presumption of guilt standard. To use the presumption of guilt standard to make the determination whether the error in refusing to quash the charging instrument was harmful makes a mockery of the presumption of innocence standard that exists in our criminal law. In sum, once it is determined that the trial court erred in not granting the defendant's motion to quash the charging instrument, the issue of whether it was harmful should be decided in the light that the defendant is presumed innocent with committing any criminal wrong, and not decided in the light that he is now presumed guilty, which is what the majority opinion in *Adams*, supra, and here actually, albiet implicitly, do.

I must ask the members of this Court who vote for the majority opinion the following questions: If it is determined that the trial judge erred in not granting the defendant's pretrial motion to quash the charging instrument, for failure to give the defendant sufficient notice of what he is charged with committing, once the trial has been held, unless the defendant has spent virtually all of his time during trial trying to establish why the error of the State in not giving him sufficient notice pretrial was not harmless, which, if that occurs, will undoubtedly unnecessarily delay his trial, how will the defendant ever establish, in the context in which the case was presented and in light of the entire record of appeal, that the error was harmful? That the defective notice egregiously harmed him? That it hindered his ability to present a defense to the charge? That it prejudiced any substantial right that he might have had? That it misled him to his prejudice? That the error had a great impact on him? That the impact was significant? That the impact adversely affected him?

The answers to these questions, of course, may be answered in only six words: "Under 'Adams the Execrable,' he can't." To say that he can represents only wishful thinking in my view. The majority opinion of *Adams*, supra, and here closely resemble asking someone questions about a movie that he has just seen, rather than asking questions without him having seen the movie.

When the error cannot, as a matter of law or fact, ever be reversible error, why dilly, dally around? Why doesn't the aggressive and assertive majority of this Court just haul off and hold the following: "We need not decide whether the trial court erred in not granting the appellant's motion to quash the indictment because, even if we found error, as a matter of law, he has failed to show, in the context of the way that the case was tried, and given the en-

---

1. Although often cited by this and other courts, a careful reading of this Court's opinion of *American Plant Food Corporation v. State*, 508 S.W.2d 598 (Tex.Cr.App.1974), concerning the discussion about a defendant's motion to quash, easily reveals that everything stated after the statement, "This ground is multifarious ..." (602), is obiter dictum, as that legal term is defined in *Black's Law Dictionary*.

tire record of appeal, egregious harm." Why spend almost eight pages dispensing a bunch of meaningless gobbledygook to the bench and bar of this State when the issue can be decided in one sentence? Why give the illusion that such error can be reversible error when it will always be held to be harmless?

I also dissent to the majority opinion because I believe that the two pronged test of *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), which this Court has in the past religiously adhered to, should not be abandoned in favor of the "totality of the circumstances" test pronounced in *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). The *Aguilar,* supra, two pronged test has served the criminal jurisprudence of this State well. Simply because an aggressive and assertive majority of the Supreme Court woke up one day and decided to vote to abandon the *Aguilar* two pronged test is simply not justification for the members of this Court to follow suite. When it comes to interpreting our State law, we do not exist as mimics of the Supreme Court of the United States. Therefore, I respectfully dissent to the majority's reliance upon *Gates,* supra, to dispose of appellant's contention that the arson affidavit does not contain sufficient probable cause facts. For the reasons stated in *Winkles v. State,* 634 S.W.2d 289, 291–293, 295–297 (Tex.Cr. App.1982) (On original submission), the arson affidavit clearly does not, under *Aguilar,* supra, set out sufficient facts that might establish that the "source" was "credible".

In disposing of appellant's points of error numbered three and four, that the trial court erred in admitting into evidence appellant's extrajudicial oral and written statements, I find that the majority's holding that appellant's question to Detective McNaulty, "How is everyone in Georgia doing?", "reflected a desire on the part of appellant to open up a more generalized discussion relating directly or indirectly to the investigation [of the Wannstrath murders]" borders on being a statement that comes to us from fantasyland, and I will not further comment on this because to do so might cause one to conclude that I, too, have drifted over into fantasyland from the real legal world that we must live in. I will therefore simply dissent to the majority opinion's overruling appellant's third and fourth points of error on the basis that it does.

I respectfully dissent not only for the above expressed reasons, but for others as well, but to do so would only unnecessarily elongate this opinion.

DUNCAN, Judge, dissenting.

I dissent to the Court's disposition of appellant's first ground of error.

In *Adams v. State,* 707 S.W.2d 900 (Tex. Cr.App.1986), a majority of the Court elected to overrule the dictates of *Jeffers v. State,* 646 S.W.2d 185 (Tex.Cr.App.1981) (Opinion on State's Motion for Rehearing) which had emphasized that a defendant is constitutionally entitled to obtain notice of the offense from the face of the indictment. In overruling *Jeffers* the Court reinstated the approach announced in *Craven v. State,* 613 S.W.2d 488 (Tex.Cr.App.1981): if the alleged defect in the indictment is a matter of form (as opposed to substance) then the appellate review is directed by Art. 21.19 V.A.C.C.P. which requires that substantial rights of a defendant must be prejudiced before the "indictment ... [can be] held ... insufficient." Art. 21.19, supra. And, in order to make such a review it is necessary to examine the statement of facts.[1] Thus, at least in this instance, "harm" is synonymous with a defendant having a substantial right prejudiced.

---

1. It should be noted that *Craven v. State, supra,* involved a plea of guilty to a charge of misdemeanor theft. The plea was based upon a plea bargain; thus, the trial court's rejection of the defendant's motion to quash (information was " 'insufficient to appraise ... [him] ... of what the State intends to prove ...,' " *Id.* at 488) was preserved for review. The court simply concluded that because of its sparsity the record "will not shed any light on the ultimate issue of prejudice to substantial rights of appellant though there be error in denying the motion to quash." *Id.* at 490.

In making such a ruling the panel in *Craven* adopted the distinctions between "form" and "substance" as detailed in *American Plant Food Corp. v. State*, 508 S.W.2d 598 (Tex.Cr.App.1974).[2] In summary, the *American Plant Food Corp.* case, albeit somewhat contradictorily, concluded that notice defects "though relating to the substance of the charge [indictment] in one sense, are ... grounds for an exception to form ... and not for an exception to the substance of an indictment...." *Id.* at 603.

This distinction between form and substance, although not detailed precisely in every succeeding case dealing with this issue, has been interjected into the formulation for the rule adopted in *Adams*. However, as far as I can tell, it has not been noted previously that the distinction between form and substance made in the *American Plant Food Corp.* case was limited to a determination of whether the alleged error in the information in that case was fundamental.[3] In other words, whether the claimed error had to be preserved for review by a motion to quash or, conversely, whether the error dominated the proceedings to the extent that even in the absence of a proper pretrial objection the error would mandate reversal of a conviction was the issue confronting the court. The case had absolutely nothing to do with the dictates of Art. 21.19 and the statutorily imposed limitations on reviewing indictments. Limited to the issue of fundamental error, the case is correct. It is, however, not *stare decisis* for this issue. It is rather merely dictum that can properly and with no disrespect to authority be rejected. And, should be.

Further, to argue that the failure of an indictment to provide adequate notice in which to formulate a defense to a prosecution is a matter of mere form rather than substance ignores both the invaluable purpose of the indictment[4] and the observations Judge Odom made in *American Plant Food Corp.*: notice does have a relationship to the substance of an indictment.

In distinguishing between form and substance the Court in *American Plant Food Corp.* relied entirely upon the relationship between Art. 27.09 V.A.C.C.P. (Exception to Form of Indictment) and Art. 21.21 (7) V.A.C.C.P. (Requisites of an Indictment: "The offense must be set forth in plain and intelligible words.") However, in the context of determining whether adequate notice has been given to a defendant in the indictment, one's attention must focus upon Art. 21.11 V.A.C.C.P., which provides:

> An indictment shall be deemed *sufficient* which charges the commission of the offense in ordinary and concise language in such a manner as to enable a person of common understanding to know what is meant, and with that *degree of certainty that will give the defendant notice of the particular offense with which he is charged,* ... (Emphasis added.)

The logical and obvious converse interpretation of that provision is: if that pleading criteria is not met then the indictment will be deemed insufficient. Surely, a statute that directs both the style in which an alleged offense is pled, as well as the extent of the content necessary to adequately plead the alleged offense relates more to the substance of an indictment than its form. As such, Art. 21.19 V.A.C.C.P. is not even applicable. Consequently, a review of the statement of facts to discover harm is neither necessary or appropriate.

---

**2.** "See ... *American Plant Food Corp. v. State,* ... [citations omitted] which nicely delineates matters of substance and form...." *Craven v. State, supra* at 490.

**3.** Because of Art. 21.23, V.A.C.C.P., what is said about an information will be equally true of an *indictment.*

**4.** For an excellent article on indictments in general, including *how much* notice a defendant is to be given by the indictment see: Dix, "Texas Charging Instrument Law: Recent Developments and the Continuing Need for Reform," 35 *Baylor Law Review* 692 (1983). Therein, Professor Dix states:

> It is also significant that the Code of Criminal Procedure provides no alternative method by which a defendant might obtain notice, beyond that provided by the charging instrument, concerning the theory or theories that the State will rely upon at trial. *Id.* at 696.

Even assuming that inadequate notice is a defect of form rather than substance, there is another reason *Adams* is inappropriate authority. The majority opinion concludes the appellant was not harmed by the "indictment's failure to name the party who remunerated or promised remuneration to the appellant ...," because he "has totally failed to show how he was harmed by the trial court's admittedly improper refusal to grant his motion to quash." The difficulty I have with such reasoning is that it essentially demands the impossible: the imposition of hindsight, the most clear and unencumbered vision, upon foresight, a vision that is impaired by the unknown, with the expectation that a valid pragmatic judgment can be made. In other words, by utilizing *Adams* the majority assumes the responsibility of judging, or more appropriately surmising, whether the appellant was harmed by the deficient notice of the indictment by examining the conduct of the defense counsel during the trial, or whether an absence of harm is otherwise apparent from the record. Thus, rather than require that the indictment set forth "[e]verything ... which is necessary to be proved," Art. 21.03 V.A.C.C.P., the majority opinion in essence holds that even though the information should have been provided the appellant, he must also prove that the refusal to give him the information affected his defense in some detrimental manner. This amounts to the court deciding after the trial what information should be presented in the indictment before the trial because of what happened during the trial. With all due respect to the majority's opinion, I find no logic in such reasoning.

Specifically, the appellant was prosecuted for capital murder on the basis that it was committed "for remuneration or the promise of remuneration." Sec. 19.03(a)(3), V.A.P.C. Thus, common sense, if nothing else, demands that to prove such an allegation the State has to prove that someone gave the appellant money to kill the deceased or promised to do so. In short, it is apparent to me that before a conviction can be legally achieved in a prosecution of this

nature the State would have to prove all of the elements of the offense. And, one of the statutory elements is that someone gave or promised the appellant remuneration for killing the deceased. It is therefore undeniable that that "someone" is something "which is necessary to be proved." Art. 21.03 V.A.C.C.P. Consequently, that "someone" should have been named in the indictment. Not surprisingly, the majority agrees with this conclusion. We then part company because the majority thereafter performs the erroneous harm analysis advocated and compelled by *Adams*. I point out that I cannot find in the Code of Criminal Procedure any language that limits the dictates of Art. 21.03 V.A.C.C.P., such as: adequate information does not have to be pled if a defendant already knows it. Furthermore, there is no language in the Code of Criminal Procedure that specifically authorizes a harm analysis on a deficient indictment. The majority opinion imposes such an exception on Art. 21.03 V.A.C.C.P.

To support its unauthorized legislative proclivity several fallacious explanations are made. For example, the State argues that the appellant had notice because he had two codefendants, Duff–Smith and Waldhauser; that the appellant's counsel had seen the State's file; "appellant had told Karen that Mark Duff–Smith was paying to have it all done;" and, "Karen had told ... [that] Duff–Smith was behind it." In an almost gullible fashion the majority uses these arguments to support its conclusion that the appellant has failed to show he was harmed. However, as will be pointed out, the telling thing about the State's arguments is not what they say, but what they do not say.

Taking each in order: Duff–Smith and Waldhauser were not really codefendants. The Appellant was the only person indicted in the trial court under the applicable cause number. The record does reflect that Duff–Smith and Waldhauser were charged with the same capital murder but it doesn't reflect that either were charged with being the party that provided the remuneration.[5]

5. As Judge Teague in his Dissenting Opinion notes, this is a companion case to *Duff–Smith v.*

Rhetorically, how does this argument alone support the State's position that the Appellant knew who provided the money?

Next, the State argues that Appellant's counsel "had seen the State's file or *substantial portions* thereof." [emphasis added] But, just what did Appellant's counsel see when he examined the file? If, as the State contends, appellant's counsel already knew who was providing the remuneration, maybe that information wasn't substantial enough to be included in the file. The record does not show what was in the State's file, or when the appellant's attorney examined it.

In the appellant's comments to Karen he did concede that Duff–Smith was "paying to have it all done." However, that admission fails to identify what, if anything, the appellant knew of Waldhauser.

Finally, there is the comment of Karen to a detective that "Duff–Smith was behind it." Note, that comment is not attributed to the appellant. Equally significant is what she did not say to the detective: what the appellant knew of Waldhauser's role.

I recognize the above comments, which discount the explanations used to support the absence of harm, are speculative to the point of being almost imaginative. But no more so than the majority's speculation when it reaches the opposite conclusion.

One must also note that there is a relationship between Art. 21.03, V.A.C.C.P. and Art. 21.19, V.A.C.C.P. Assuming again that the absence of notice goes to the form rather than the substance of the indictment, *American Plant Food Corp. v. State, supra,* it is imperative that in reviewing the statement of facts pursuant to the limitation imposed by Art. 21.19, as required by *Adams v. State, supra,* the relevance of Art. 21.03, V.A.C.C.P. should not be forgotten. Unfortunately, the majority has done just that. As stated previously, since a conviction could not have been acquired under this indictment without the State proving "someone" paid or promised to pay the appellant then that "someone" became something "which is necessary to be proved." Art. 21.03, V.A.C.C.P. Therefore, it is an element of the offense necessary to be pled. Accordingly, it was one of the appellant's "substantial rights ...," Art. 21.19, V.A.C.C.P., to be given that information. The failure of the State to plead that information prejudiced that substantial right. Thus, even under the majority's theory, when taking into consideration Art. 21.03, V.A.C.C.P., it is evident that the appellant's motion to quash should have been granted.

As an additional example to support its position, the majority states: "It appears that the indictment's failure to name the party who remunerated or promised remuneration to the appellant, in no way figured into the appellant's defense at trial." It attempts to rationalize this statement by asserting that the appellant's "only position at guilt-innocence was that his confessions were improperly admitted into evidence...." The necessary extension of that position is that should a defendant elect to rely upon his constitutional right of having the state prove his guilt beyond a reasonable doubt, *In Re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), and not actively assert a defense, then this Court will interpret that as his already having knowledge of the requested information and that will be viewed as indicative of his not being harmed by failing to receive information he was unquestionably entitled. The absurdity of that proposition needs no further elaboration.

Be all that as it may, the most unfortunate aspect of the majority's opinion is that

---

*State,* 685 S.W.2d 26 (Tex.Cr.App.1985). Although nothing in that record can be used to examine this case, *Garza v. State,* 622 S.W.2d 85 (Tex.Cr.App.1981), the reported decision of the Court is, shall we say, ironical. For example, *Duff–Smith* was charged in two paragraphs with the capital murder of his mother. The first paragraph alleged that he employed *Walter Waldhauser* to kill his mother "for remuneration or the promise of remuneration." *Duff–Smith v. State, supra* at 33. The second paragraph alleged that he murdered her for the "proceeds of ... [her] estate." *Id.* at 34. He was convicted under the "second paragraph of the indictment," *Id,* "as a party to the offense." He was *not* convicted of paying the appellant or Waldhauser to commit the murder.

it condemns the appellant for failing to show "how he was harmed by the trial court's admittedly improper refusal to grant his motion to quash." However, it never recognizes that when this case was tried such a showing of harm was not a procedural requirement, and, worse than that, it does not even suggest or authorize a means of his now doing so. At the time this case was tried the appellant perfected his claimed error in accordance with the procedure in effect at that time: a specific and timely filed pretrial motion to quash. *American Plant Food Corp. v. State, supra.* This appellant will nevertheless suffer the death penalty, which is so " 'unique in its severity and irrevocability,' " *Tison v. Arizona,* — U.S. —, —, 107 S.Ct. 1676, 1683, 95 L.Ed.2d 127 (1987), because the record before this Court does not reflect something it did not have to reflect until some three years after this case was tried, or until *Adams v. State, supra.* Furthermore, and most tragically, the appellant will not even be given the opportunity to try to show something (harm) that he was never required to do before *Adams v. State, supra.* The majority's decision to close its collective eyes to this blatant injustice is unfortunate and frankly alarming.

Because the majority refuses to recognize that *Adams* is an invalid analysis tool and should therefore be expressly overruled, I dissent.

Alternatively, at the very least the case should be remanded to the trial court for a hearing to allow the appellant to show, if he can, that he was harmed by the trial court's denial of his motion to quash. Cf. *Keeton v. State,* 724 S.W.2d 58 (Tex.Cr. App.1987); *Henry v. State,* 729 S.W.2d 732 (Tex.Cr.App.1987).[6] Because the majority refuses to take even this short step and thereby insure that the appellant had a fair trial I dissent. Time, in the context of an execution, is an inexhaustible commodity —I am sure the needle of death would be willing to wait those few months it would take to have the proposed hearing and for

this Court to review the record. Unfortunately, the majority is not similarly inclined.

ONION, P.J., joins this opinion.

## OPINION ON APPELLANT'S MOTION FOR REHEARING

■ Appeal is taken from a conviction for capital murder. After finding appellant guilty, the jury returned affirmative answers to the first two special issues under Art. 37.071(b), V.A.C.C.P. Punishment was assessed at death. On original submission, this Court affirmed appellant's conviction. See page 813.

In his first ground for rehearing, appellant challenges the manner in which this Court disposed of his first point of error. There, appellant maintained he was deprived of adequate notice by the State's failure to include the name of the person providing the remuneration in the indictment. This Court found appellant had been denied a requisite item of notice within the indictment. However, under the test set forth in *Adams v. State,* 707 S.W.2d 900 (Tex.Cr.App.1986), no reversible error was present. Specifically, it was held:

It appears that the indictment's failure to name the party who remunerated or promised remuneration to the appellant in no way figured into the appellant's defense at trial. Appellant's only position at guilt-innocence was that his confessions were improperly admitted into evidence and that, absent the confessions, the evidence against him was generally insufficient. The issue of the indictment's failure to name the remunerating party was not raised in a motion for new trial. As the record stands, appellant's ability to prepare a defense was not affected by the trial court's admittedly improper refusal to grant his motion to quash. Since the record, when viewed in the context of the case, fails to show that the deficiencies in the indictment

---

6. Both *Keeton* and *Henry* were remanded for the purpose of a hearing to explore whether any racial discrimination infected the jury election

process as required by *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

had any clear impact, the second requirement of the Adams test is not met. at 821.

In his motion for rehearing, appellant points out *Adams v. State, supra,* was decided after the instant cause was tried. Under such circumstances, appellant urges this Court should remand the cause to the trial court to give appellant an opportunity to demonstrate harm under the *Adams v. State, supra,* analysis. We agree.

Appellant's motion for rehearing is granted on ground for rehearing No. 1 but only insofar as appellant shall be given an opportunity to demonstrate harm as a result of the trial court's error in overruling the motion to quash. The trial court shall hold a hearing to allow appellant to more fully develop his allegation of harm. The record of such proceedings shall be forwarded to this Court within 120 days of the date of this opinion. Appellant's remaining grounds for rehearing are denied.

The appeal is abated and the cause is remanded to the trial court for further proceedings consistent with this opinion.

CLINTON, J., would grant ground for rehearing No. 2.

TEAGUE, J., without qualification or limitation votes to grant in all things appellant's motion for rehearing, but does not object to what the majority orders.