Allan Wayne JANECKA, Appellant,

v.

The STATE of Texas, Appellee.

No. 68881.

Court of Criminal Appeals of Texas, En Banc.

Jan. 31, 1990.

On Rehearing Jan. 15, 1992.

Dissenting Opinion on Rehearing Jan. 15, 1992.

Rehearing Dismissed Feb. 12, 1992.

Kenneth W. Sparks, Doug O'Brien, Houston, for appellant.

John B. Holmes, Jr., Dist. Atty., Timothy G. Taft, Robert A. Moen (Opinion after Remand only), Asst. Dist. Attys., Houston, Robert Huttash, State's Atty., Matthew W. Paul, Asst. State's Atty. (Opinion on Rehearing only), Austin, for the State.

## OPINION AFTER REMAND FOR EVIDENTIARY HEARING

W.C. DAVIS, Judge.

Appellant was convicted of capital murder under the remuneration section of V.T.C.A. Penal Code, Sec. 19.03(a)(3) and was sentenced to death by injection after the jury returned affirmative findings to the first two special issues under Art. 37.-071(b), V.A.C.C.P. On direct appeal we affirmed the conviction. *Janecka v. State,* 739 S.W.2d 813 (Tex.Cr.App.1987). Appellant then filed a motion for rehearing, alleging this Court erred in disposing of his first point of error wherein he contended the trial court erred in overruling his motion to quash the indictment as he was deprived of adequate notice by the State's failure to include within the indictment the name of the individual providing the remuneration in the killing for which he was charged.[1]

On original submission this Court found appellant had been denied a requisite item of notice but held the error to be a defect of form rather than substance. Applying the test set out in *Adams v. State,* 707 S.W.2d 900 (Tex.Cr.App.1986), we held the error to be harmless.[2]

Because *Adams,* supra, was decided after the instant cause was tried, we agreed with appellant in his motion for rehearing

---

1. For a complete discussion of the facts of the case *see Janecka v. State,* 739 S.W.2d 813 (Tex. Cr.App.1987).

2. Under the *Adams* test, the important question to answer is whether a particular defect of form in the charging instrument prejudiced the substantial rights of a defendant. It must first be determined whether the charging instrument failed to convey some requisite item of "notice." If sufficient notice was given, the inquiry ends. If not, the second step is to determine whether, in the context of the case, the deficiency had an impact on the defendant's ability to prepare a defense, and if so, how great an impact.

that he be given an opportunity to demonstrate harm as a result of the trial court's error in overruling the motion to quash. We abated the appeal and ordered the trial court to hold a hearing to allow appellant the opportunity to fully develop his allegation of harm. Appellant's remaining grounds for rehearing were denied. *Janecka,* 739 S.W.2d at 841–42.

■ The sole question presented is whether, in light of his opportunity to produce testimony and develop an adequate record at the evidentiary hearing held below, appellant is now able to demonstrate that the failure to name a remunerator in the indictment had an impact on his ability to prepare a defense and he was thereby harmed.

Pursuant to this Court's order, a hearing was conducted on March 3, 1988. The State and defense produced expert and other lay witnesses who testified regarding the case. By agreement of the parties, the State was allowed to present its sole witness before the defense was put to its burden of proof in the matter. Robert A. Moen was the chief prosecutor in the Janecka case. He related details of the crime and testified that a plea agreement with accomplice Walter Waldhauser was completed prior to appellant's trial.[3] Moen remembered a motion to quash being filed by the defense, but he determined it was not necessary to file a new indictment alleging a remunerator.

The defense then called a series of five witnesses. Mack Arnold was the former chief prosecutor in the Gertrude Zabolio murder case, wherein Markham Duff–Smith was tried and convicted. *See Duff–Smith v. State,* 685 S.W.2d 26 (Tex.Cr.App. 1985). He testified that Duff–Smith was

indicted but never tried for the murders of the Wanstrath family. Waldhauser was available as a witness in the Zabolio case but was not called because he was considered untrustworthy and unreliable. If he had been called to testify, all the plea bargaining material, including the capital charges against him, would have been available for impeachment.

Attorney Robert Scardino, Jr. represented Waldhauser during the time in question and negotiated the plea bargain with the State, the contents of which by agreement were to remain secret. In order to avoid breaching the agreement of non-publicity, the hearing judge ordered the plea agreement admitted into the record as a sealed document. The attorney also informed the court that Waldhauser had since recanted his confessions.

Scardino was asked specific questions regarding the impact on the defense of the failure of the indictment to name Waldhauser as remunerator. In his opinion, by eliminating the remunerator, the State eliminated the necessity for proving who had paid for the killing. If Waldhauser had been named, he would have had to testify, thus opening the door for the defense to prove that someone other than the person named in the indictment had been the remunerator.

Counsel Kenneth Sparks next called himself to the witness stand. He testified the prosecutor had kept a closed file in the instant case, although the defense was allowed to inspect certain items of physical evidence. After the trial court overruled the motion to quash the defense was left with the sole strategy of attempting to show appellant's confessions were involuntary. Because a remunerator was not

---

3. The plea bargain was admitted at the evidentiary hearing as a "sealed exhibit". Since Waldhauser did not testify at appellant's trial, the bargain played no part in the proceedings. Although there was apparent agreement between the parties that the document would not be publicized, it has now become a focal point in appellant's burden on remand to demonstrate harm. Waldhauser, the District Attorney's office and the trial court entered into a written agreement stating that Waldhauser, in exchange for his statements, and subsequent testimony at

any of four murder trials and several possible conspiracy to commit murder trials, and his plea of guilty in three of the four murder cases, would receive three concurrent 30 year sentences on the reduced murder charges. In addition, Waldhauser was guaranteed his sentence would be spent in the Diagnostic Unit at the Texas Department of Corrections, and he would be given complete transactional immunity covering the other murder and conspiracy to commit murder cases.

named, the defense was unable to test the State's proof regarding the identification of the remunerator, effectively eliminating the possibility of showing a variance between what was plead and what the State was able to prove, thereby eliminating defense strategies of moving for an instructed verdict, conviction on a lesser offense of murder rather than capital murder, impeachment of Waldhauser, or at the least, mitigation of punishment based upon Waldhauser's active participation in the murder and favorable treatment through plea bargain with the State.

Attorney Doug O'Brien had also participated in the defense. He "totally agreed" with Sparks's testimony.

Attorney Randy Shaffer was called as an expert witness and given a hypothetical using the same facts as in the instant case. Shaffer testified that trial counsel required actual, formal notice of the alleged remunerator in order to adopt a strategy of attempting to secure a lesser conviction. Without a specific allegation in the indictment, the defense would be unable to cast doubt on the individual who was so named and thus raise the possibility of a lesser charge being given the jury. A formal allegation was also, in Shaffer's opinion, necessary to possibly enable the defense to test the sufficiency of the evidence by either a motion for instructed verdict or to argue sufficiency on appeal. There was absolutely "no other way to do it." On the punishment issue, Shaffer pointed out that evidence of Waldhauser's favorable plea bargain could act to mitigate against imposition of capital punishment.

A Special Master, sitting by order of the trial court, made the following findings of fact:

1. The State's file was closed to the defense, and the police offense report was not obtained by the defense from any other source.

2. The appellant's confession among other things reveals:

a. Page 2, last paragraph—appellant stated that Walter Waldhauser never mentioned the name "Mark."

b. Page 5, first paragraph—appellant read the name of Mark Duff–Smith in the newspaper and asked Walter Waldhauser about Duff–Smith's involvement, but Waldhauser never directly confirmed that Duff–Smith was behind anything.

c. Page 5, fourth paragraph—appellant, and Walter Waldhauser split money for the murder, but there is no mention of the source of the funds or the identity of the remunerator.

d. Page 5, last paragraph—appellant "figured" Duff–Smith had something to do with it, but never met him.

3. The defense filed a motion to Quash the Indictment seeking the identity of the remunerator for the following reasons:

a. to seek information;

b. to be able to defend the capital element of remuneration to allow a jury verdict of the lesser included offense of murder;

c. to seek an instructed verdict at the close of the State's case regarding:

(i) insufficient evidence as to the remunerator;

(ii) a possible variance in proof regarding the remunerator.

4. The defense was unaware of what the State would attempt to prove regarding the identity of the remunerator except that the possibilities were Mark Duff–Smith and Walter Waldhauser.

5. Walter Waldhauser, co-defendant with appellant, made a written plea bargain agreement with the State prior to the date appellant's trial began that included an agreement that he would be sentenced to thirty (30) years in the Texas Department of Corrections, and that he would not be prosecuted for other crimes that he had committed.

6. The written Waldhauser plea agreement would have been admissible for impeachment purposes had Waldhauser been called as a witness by the State.

7. Waldhauser was not called as a witness by the State. The jury was unable to hear the details of his plea bargain.

8. The defense made no attempt to demonstrate or establish harm resulting from the overruling of the Motion to Quash since the defense was not aware that it had any burden or requirement to do so. However, the Appellant's Motion in Arrest of Judgment filed following conviction alleged that the failure to name the person providing the remuneration failed to give the defendant proper notice and left him unable to properly defend himself.

9. The defense strategy was, if Walter Waldhauser had been named in the indictment as the remunerator and been called as a witness and the appellant had been convicted of capital murder, then, appellant's attorneys would have handled the punishment state (sic) and punishment argument differently. They would have compared and contrasted the light sentence of Walter Waldhauser by virtue of his plea bargain and the prosecution's request to the jury for a death sentence for the appellant even though they were co-participants in the killings..

10. The defense never knew what theory the State would pursue during its case in chief regarding the identity of the remunerator except that it could be Duff–Smith or Waldhauser until the State rested its case and the defense then learned that the State was not going to prove any theory.

11. The defense was unable to rely on any allegation of the identity of the remunerator by the State since the indictment did not contain an allegation regarding the identity of the remunerator.

12. Markam (sic) Duff–Smith was never prosecuted for the Wanstrath killings.

In the present case, after reviewing the record and prior opinions in the case, we find the Special Master's findings of fact relative to the issue on remand are supported by the record and will be adopted by this Court. We may now turn to the legal question upon which the cause was remanded; that is, whether appellant was successful in demonstrating he suffered harm as a result of the defect in form under the *Adams* standard.

Based upon the findings of fact, his review of the appellate record, and all documents in the trial court's file, the Master made the following conclusions of law:

1. The appellant was harmed by the State's failure to name the remunerator in the indictment and the Court's failure to grant the appellant's Motion to Quash the Indictment.

2. The lack of an allegation regarding the identity of the remunerator in the indictment had a negative impact on the appellant in terms of preparing and conducting his defense.

3. The State was never put to a test of proof regarding the identity of the remunerator by its failure to allege the remunerator.

4. The testimony of Walter Waldhauser, if called as a witness by the State, would have provided ammunition for the defense to impeach him and would have provided an unfavorable comparison between the punishment of Waldhauser and the requested punishment of appellant.

5. The defense was deprived of the opportunity to establish a variance or contest the sufficiency of the evidence regarding the identity of the remunerator.

The above findings and conclusions were subsequently adopted by the trial court on March 11, 1988. The record of the evidentiary hearing, together with the findings and conclusions above, were subsequently filed with the Clerk of the court.

It is a question of law under the *Adams* standard whether, "in the context of the case, this (failure to convey some requisite item of 'notice') had an impact on the defendant's ability to prepare a defense, and finally, how great an impact." *Adams*, 707 S.W.2d at 903. The trial court, through Special Master, was correct to review the record for prejudice to appellant's substantial rights from the defect of form in the charging instrument as directed by this Court's remand instructions. Although we are not bound by those conclusions of law, in the instant case we are constrained to hold that the conclusion reached by the trial court is supported by the record. Ap-

pellant was faced with the possibility of defending against an allegation naming one or both possible remunerators: Markham Duff–Smith and Walter Waldhauser. In addition to the indictment being silent as to who paid for the killing, the prosecutor's file was not open for inspection by defense counsel. It is difficult to measure the equity in requiring a defendant to prepare for trial, especially in a capital case, without benefit of notice of a highly material, if not "substantive" factor being revealed by the State in its indictment which will allow investigation and strategic decisions regarding the case to be made.

Unlike the case in *Adams,* supra, the instant cause does not concern a choice of unnamed but substantially similar descriptive elements in the indictment. There, Adams contended he was hindered from preparing his defense against a charge of obscenity because the State failed to allege which of two films were allegedly obscene. Without notice of what material was allegedly obscene, Adams contended, he could not prepare an adequate defense. We agreed with the Court of Appeals' finding that the motion to quash should have been granted for failure of notice but also agreed with that panel's conclusion that Adams had failed to show his substantial rights had been prejudiced by the defect in form. Because the films were so similar, in that they depicted essentially the same conduct or sexual acts, Adams could not possibly have defended on a theory applicable to one film but not the other.

In contrast, the instant case presents a different scenario. The similarity with *Adams,* supra, ends with the number of possible descriptive elements which could have been included to provide notice of the offense. If the indictment had named Duff–Smith as the remunerator, the record reflects the defense would have provided testimony showing Waldhauser never directly confirmed Duff–Smith's involvement and never mentioned the name "Mark" to appellant. Waldhauser's own statements, never an issue at trial because he was not called as a witness, showed money was shared between himself and appellant, but did not identify the source of the funds as Duff–Smith. Absent sufficient proof of Duff–Smith as remunerator, the defense strategy would have been to seek a conviction on the lesser offense of murder, thus avoiding the death penalty, or to set up an issue for appeal concerning a variance between the allegations in the indictment and the proof at trial.

Similarly, the facts elicited at the evidentiary hearing reflect that the defense could have benefited if Waldhauser had been named as remunerator. Waldhauser had in fact been named in another related and pending indictment, a fact which may perhaps reflect upon the State's motivation in structuring the instant charging instrument but has no practical effect upon the disposition of this appeal. The basic strategy of the defense, had Waldhauser been named as remunerator, and assuming Waldhauser would have been called to testify, would have been to first attempt to impeach Waldhauser with his plea agreement. If a capital conviction was nevertheless returned, the defense would point out that Waldhauser, an active participant in the killings, had been granted leniency by the State, the inference being that appellant deserved an equal sentence. While we may review such contentions with some skepticism, we can but speculate that the jury would have returned the same verdict or answered the special issues in the same manner. It is, however, entirely logical that the State would have had to call Waldhauser to the stand to testify had the indictment contained a specific allegation as to the remunerator. The language used in the plea agreement shows the State at least considered using him as a witness. The allegation on a separate indictment relating to the same series of killings naming Waldhauser as remunerator would tend to show that Waldhauser was a known factor in the equation. By not naming any individual as remunerator, the State effectively prevented the defense from exploring both the relationship of Waldhauser to the case as well as his preferential treatment by the authorities. Although it is by no means certain that the defense could successfully have defended against the cap-

ital offense or obtained a sentence less than death, there is no doubt that the substantial rights of appellant to *pursue* such strategic avenues was prejudiced by the defect in form.

The testimony elicited at the evidentiary hearing reflects the State's failure to name a remunerator impacted upon the ability of the defense to attempt to prove a variance between the indictment and evidence during the first stage of trial, and its ability to mitigate punishment at the second stage. Under the *Adams* test, appellant has demonstrated harm in that the particular defect of form in the charging instrument prejudiced his substantial rights. *Adams,* supra.

The conviction and sentence are reversed, and the cause is remanded to the trial court for new trial. Art. 44.29(c), V.A.C.C.P.

WHITE, J., concurs in the result.

DUNCAN, Judge, concurring and dissenting opinion.

I do not think that the appellant was able to show under *Adams v. State,* 707 S.W.2d 900 (Tex.Cr.App.1986) that he was harmed by the absence in the indictment of the name of the individual who was going to supply the money for the murder. However, I still maintain that it is incorrect to designate that information a matter of form rather than substance. See: *Janecka v. State,* 739 S.W.2d 813 (Tex.Cr.App.1987) (Duncan, J. dissenting). Therefore, as far as I am concerned, *Adams v. State,* supra was not even applicable. Therefore, I concur in the result.

CAMPBELL, Judge, dissenting opinion.

The proper standard for evaluating a motion to quash, when based on a notice defect, was set out in *Adams v. State,* 707 S.W.2d 900 (Tex.Cr.App.1986).

> The important question is whether a defendant had notice adequate to prepare his defense. The first step in answering this question is to decided whether the

charging instrument failed to convey some requisite item of 'notice'. If sufficient notice is given, this ends our inquiry. If not, the next step is to decide whether, in the context of the case, this had an impact on the defendant's ability to prepare a defense, and, finally, how great an impact.

*Adams,* 707 S.W.2d at 903. In *Janecka I,* 739 S.W.2d 813. This Court answered the first question posed by *Adams* in the affirmative. After holding that appellant was entitled to indictment-notice of the identity of the remunerator, we remanded this case in order to allow appellant to provide evidence concerning what impact this notice defect had on his defense. *Janecka I,* 739 S.W.2d at 842 (opinion on rehearing).

In response to the evidence adduced at this hearing, several findings of fact were made.[1] The majority holds that these findings of fact are supported by the record, and therefore accepts them as true. I do not dispute the accuracy of these findings. Instead, I believe that these facts provide an insufficient showing of harm to warrant reversal under *Adams.*

The majority inexplicably focuses on four aspects of appellant's defense that might have changed had the State pleaded the identity of the remunerator in the indictment. The majority's first assertion is that Walt Waldhauser would have been forced to testify, thus allowing appellant the opportunity to impeach Waldhauser's testimony. Such a suggestion is unfounded. First, had appellant's motion to quash been granted, and the State had amended the indictment, the indictment could have identified either Waldhauser or Markham Duff–Smith individually; it could have identified both Waldhauser *and* Duff–Smith; it could have identified Waldhauser *or* Duff–Smith; or, finally, it could have alleged any and all of these combinations in the alternative. Assuming arguendo that the State would have chosen to narrow its available theories of prosecution by alleg-

---

1. Because, the majority opinion sets out these findings of fact, we need not reiterate them here. See majority op. pp. 235–236.

ing only a single remunerator and further assuming that the State would have chosen Waldhauser as that person, there is no legal basis for assuming that Waldhauser would have testified at trial.[2] The majority's first reason for finding harm is an unfounded legal conclusion based on an unfounded factual assumption.

The majority's second observation is that additional pleading would have created the possibility of appellant benefitting from a variance in proof. Again, this argument rests on the faulty assumption that the State would have alleged that Waldhauser was the sole remunerator. As discussed above, there is no reason to believe that the State would have limited its trial options by amending the indictment in this way.[3] The majority's third suggestion for possible harm is that appellant was forced to argue that his confession was made involuntarily, and if Waldhauser had been named as the remunerator, he could have focused his efforts on impeaching Waldhauser. First, this argument, once again, assumes that an amendment to the indictment would have somehow forced Waldhauser to testify. Second, even had Waldhauser testified, there is no reason to believe that any of the other evidence admitted at trial to prove remuneration would not have been introduced. Thus, even with an amended indictment, appellant would have been forced to discredit his own confession and all other evidence that was introduced on the remuneration issue. There is no basis for belief that an amended indictment would have allowed this radical shift in appellant's defense strategy.

The majority's final attempt to justify a reversal of appellant's conviction is that, at the punishment stage, appellant could have argued that Waldhauser's involvement in this offense, coupled with his sentence of thirty years, would have mitigated against the imposition of the death penalty against appellant. Whether Waldhauser was named in the indictment is irrelevant to the mitigating value of Waldhauser's participation in this case.

The Eighth and Fourteenth Amendments to the United States Constitution guarantee that a defendant can introduce *any* evidence in mitigation of imposing a death sentence. *See generally Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989); *Franklin v. Lynaugh*, 487 U.S. 164, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988); M. Sicola and R. Shreves, *Jury Consideration of Mitigating Evidence: A Renewed Challenge to the Constitutionality of the Texas Death Penalty*, 15 American Journal of Criminal Law 55 (1988). In addition, the United States Supreme Court has upheld the facial validity of our capital-sentencing scheme and ability to allow the sentencing jury to hear relevant mitigating evidence.

> Thus, Texas Law essentially requires that one of five aggravating circumstances be found before a defendant can be found guilty of capital murder, and that *in considering whether to impose a death sentence the jury may be asked to consider whatever evidence of mitigating circumstances the defense can bring before it.* It thus appears that, as in Georgia and Florida, the Texas capital-sentencing procedure guides and focuses the jury's objective consideration of the particularized circumstances of the individual offense and the individual offender before it can impose a sentence of death.

*Jurek v. Texas*, 428 U.S. 262, 273–74, 96 S.Ct. 2950, 2957, 49 L.Ed.2d 929 (1976) (emphasis added). Therefore, if the evidence of Waldhauser's involvement and sentence were, in fact, mitigating, the absence of Waldhauser's name from the indictment could not prevent evidence of his lighter

---

**2.** I know of no legal doctrine that would require the State to call Waldhauser as a witness, merely because he was named in the indictment. In addition, whether Waldhauser was or was not named in the indictment would not affect appellant's ability to call Waldhauser as a witness.

**3.** A twist on this variance argument is that, if a specific remunerator was named, appellant would have had the opportunity to challenge his identity. Appellant's confession clearly states that he has know Waldhauser for a number of years. This portion of appellant's confession would seem to make any type of mistaken identity claim untenable.

sentence from being presented to and considered by the jury.[4]

As a final observation, appellant's confession establishes that he had actual knowledge that Waldhauser remunerated him for the murders he committed. In addition, the confession clearly states that appellant also believed that the money he was paid originated from "Mark." Therefore, no additional pleading by the State would have provided appellant with information that he did not already possess or suspect.[5]

Simply stated, the possible effect on the conduct of appellant's defense that are identified by the majority do not bear close scrutiny. In addition, appellant's own words establish that he had knowledge of the issues of which he now claims that the State deprived him. For these reasons, I respectfully dissent.

McCORMICK, P.J., and BERCHELMANN, J., join.

## APPENDIX

The following is a complete transcription of a statement made by appellant on November 29, 1980. The statement was typed on a pre-printed form which related various statutory warnings and waivers. These portions have been omitted.

"I know that I have been appointed an Attorney named Phillip Scardino to represent me while I am under arrest. I have told Detective McAnulty that I want to make a statement without my attorney's presence or advice fully understanding that I am not being promised anything. I had intended to tell everything I know about this situation when I came back to Texas from Georgia this year, 1980.

"I have known Walt Waldhauser since 1975. I was introduced to him by a Paul McDonald who was a bond runner there. Walt got me involved in running guns through Florida to the Bahamas. I would fly from Houston to Miami, Florida with 6 to 12 guns and then go to the Bahamas and sell them. To the best of my knowledge, Walt was buying the guns from Don Fantich's pawn shop.

"I didn't see Walt but one time from December 1975 until June of 1978. In 1978, Walt called my mother and told her he wanted to see me. This was in the summer in July or August. I was living at my grandmother's and after I got his message I called him.

"Walt said he wanted to keep in touch with me and said he had some things in the fire but he didn't say what. Walt came over to my grandmother's several different times and would take me out to eat. During this time, I was working for Jimmy Manteris and I know that Walt and Jimmy had some kind of business dealings together. Walt or Mark Duff–Smith sold Jimmy Manteris an insurance policy on a camping trailer that Manteris owned in 1977 and they either had it burned or stolen to collect the insurance on it.

"About Christmas of 1978, I moved in with Ben Barr in Lakeside Village apartments. I lived there 3 months. I went to work for Texas Pipethreaders on the Katy Freeway. I met Rick Thran and his wife Brenda and they asked me to move in and share expenses at the Wilcrest Estates Apartments.

"Around April 1979, Walt took me to eat at the Mason Jar restaurant and he told me there was a dude that needed to be wasted meaning killed. He told me I had to do it because I had to do this because I was involved in the organization and had run guns. He didn't know when it needed to be done but he would give me more detail later. Right at three weeks later he came to Rick and Brenda's and we sat out in his car which is a light blue Buick LeSabre with white interior.

"At that time he told me that there were two other people involved that had to be wasted also. He said it was a whole family and there was a kid involved. I told him it

---

4. Appellant does not argue that the failure of the jury to hear this evidence, in and of itself, constituted error.

5. The complete text of appellant's confession is included as an appendix to this opinion.

was no use to talk to me further because I wasn't going to do that. He kept being persistent about it.

"I left out that just before this, Walt came to my job about 4 times and told me something had come up and there were two more people involved but he didn't say one of them was a kid.

"Walt when he was talking in the car with me kept saying that we needed to get it done now and wanted to know if I needed to get somebody to help me. I had quit my job because I was worrying about this whole thing at that time. I told I would ask somebody else to help him because I didn't want to do it. I asked him if he couldn't get somebody else and he said I was in it and knew too much and I didn't have no choice and to make up my mind to it.

"A boy I knew named Rick Bufkin moved in with Rick and Brenda. I asked Rick Bufkin about doing the job and he said he would go for it because he needed some money to keep up his habit and shooting speed. I think Walt and Rick Bufkin talked about killing the family, but I'm not sure because I didn't hear them. Rick Bufkin was arrested about a week later on another killing and after that Walt was worried about what happened to Rick that he might say something.

"Walt was still pressuring me to get someone and was saying the light was green and we had to get it done. I asked another person living in the apartments about doing it named Mike Spaulding. Mike said he had killed people in Florida and that he would go for it. Three days later, Mike and his wife Penney and Rick and Brenda Thran sold everything they had and went to Georgia. Mike never talked with Walt. I didn't asked anybody else to help on the job.

"Walt told me that the dude that needed to be killed had taken $50,000 bribe that was something to do with the job he had in Houston. When I asked Walt about this, he would avoid any of my questionz. He didn't tell me the peoples name at this time,

and he didn't mention Mark. He didn't tell me why all three had to be killed.

"Walt kept asking me if I could find a gun to use. I told him I wasn't going to buy a gun in my name. Walt asked me if Brenda could get a gun. This was before Brenda and Rick had moved by several days. Walt went to Brenda and asked her to help him get one but I didn't hear him asked. Walt told me later that Brenda told him she could get one for $110.00 and that it was legal.

"If remember right, the day Brenda and Rick moved or else the day he bought the gun, Walt gave it to me. Brenda did asked me what Walt wanted the pistol for but I didn't tell her and said I didn't know.

"The pistol Walt gave me was a .22 magnum Frontier Scout Colt single action. It was dark blue with brown wooded handles. It was used but in good shape. Walt also brought a whole box of .22 magnum hollow points. I still did not want to do the deal, but Walt told me I had too. About the last week of June, Walt set it up for me to do it by myself but I backed out on it. He was shook up I wouldn't go do it myself like somebody was pressuring him. This is when he said he would set it up and go with me himself. On the day it was supposed to be done, Walt told me that morning he wanted me to go rent a car and had given me money for it. I went to Avis Rental on Dairy Ashford and rented a Chev Citation, light blue in my name. Sometime between 7:30 PM and 8:30 PM that night, I drove to his apartment in Memorial near Stratford High School, I think. I didn't see Debbie's car and Walt said that Debbie was out of town. I went inside but I didn't go in the bedroom and I didn't see her.

"Walt had bought big bottle of Champagne in a styrofoam container and it had a lid on it. It may have been yellow. Walt told me the plan was to go there to show them some plans because they were interested in building a house and that would get us inside. He gave the Champagne to them also. He told me to just follow him and let him so the talking. He was wearing a blue suit with a vest and tie. I was wearing blue jeans, dress jeans and shirt.

Before we went to the peoples house, Walt told me to stop at the pay phone on the side of the Katy Fwy and around Blalock or Campbell so he could make some phone calls. He made one phone call and sat back in the car. Walt said something about the man was there right then and was at the store or something. Then he made at least two more phone calls and we were at this place about 30 to 45 minutes waiting altogether. He came back to the car after the phone calls and said we would leave as soon as the pay phone rang. I think this was out on the lot of a Gulf Stattion. The phone then rang a couple of times and he said we were on our way.

"I was driving and he directed me to where it was. I didn't know where the street was but I saw some street that was Briar something. It was off Westheimer. When we got to the house, we parked in the driveway. It was dark and about 9:00 PM. We went to the front door and rang the bell and the man and the woman came to the door. They knew Walt and called him by name. Walt gave them my name as Bobby or something like that and I never said hardly two words. Walt gave them the Champagne and said it was a little gift. I sat on the couch and the man was sitting in a chair. The woman was to his right and Walt was near the woman. The man had on a sport shirt, and the woman had on a long gown. Walt had told me that when he stood up I was to make my move and start doing it. Walt had a .38 pistol, but he never pulled it. He also had some mace in a black can in his inside coat pocket. He stood up and opened his coat pocket and I think he maced the woman. She hollered and said What is this?

"I then went to the man and shot him twice in the head standing right next to him. I didn't look at him when I did it. Walt was fighting with her and he threw her down and was holding her down. He was straddled across her. He said come on and get this one. I shot her one time in the head. Walt then said he was going to go get the jewwlry in the bedroom. He told me the baby was in the bedroom. I went in

the baby's room and and shot him in the head once and then ran out. The baby was in a baby bead. I ran out after Walt and I don't know if he had got anything because he had a briefcase. When we got in the car the mace can was still going off and it was burning my eyes. I took Walt home and he said he had to get inside and made a long distance phone call. I also went home to the Wilcrest Apt. I kept the car three days or so and took it back. I kept the pistol for several months but told Walt I had cut it up with a cutting torch. I kept it for my ace in the hole. I later heard the news on TV and read in the paper that the peoples name was Wanstrath.

"I read the name Mark DuffSmith in the paper and asked Walt who that was. Walt told me that it was the lady's brother. Walt always led e off that there was some other people behind wanting the people dead but he never directly said it was Mark behind anything. Walt always said there was three and a half million dollars behind this and that was what the outcome was supposed to give. He has also said that the the big boat would make its drop at the end of the year. Im not sure what he meant by this.

"Late in 1979, I took the pistol I used up to Weimar and gave it to my brother Kevin Janecka and told him to take the gun out in the post oak somewhere and don't let anything happen to it because it was used to kill some people. A couple of months before I went to Georgia, I went and got the gun and a boy named Cernoch (last name) had it at the ice house where he was working in Weimar. Kevin went and got it and gave it to me. I took it a couple of months later with me to Georgia where I lived with Karen Holder's mother. I left the gun with Karen when I came back to Texas around the first of October, 1980. I had told Karen what had happened and to take care of the gun. Karen once had a conversation with Walt from her mothers telling him I needed an operation on my back because I was done in my back.

"Karen told him I needed 15 to 20 thousand dollars. Karen told Walt that we had the fishing reel that he and I had used to

go fishing with and that Mr. Holmes in Houston would probably like to have it to go fishing with himself. Walt went bananas over the phone and said you don't want to do that. His voice went in spasms. I was listening on the other line. Walt only sent us a total of $600, $200 at a time by Western Union. He didn't use his name. He sent it to Karen Holder once and another time in my name. Once it had a Wilcrest St. return address, but not 718 Wilcrest.

"Walt had in the past just after the job, he and I were getting $30,000 to split; I think I ended up getting between $11,000 and $14,000 total. Once I got $2,000 and later I got a $1,000 a month or so. This was always in cash.

"Walt once mentioned the Minnie McFarland Estate being involved somehow. I also figured Mark had something to do with it, but when I asked to meet Mark, Walt said it was best I didn't [sic in passim]."

## OPINION ON STATE'S MOTION FOR REHEARING

OVERSTREET, Judge.

Due to the somewhat protracted nature of the proceedings on direct appeal in the instant cause, it is necessary to briefly detail the prior actions hereon. The instant offense was alleged to have occurred on or about July 5, 1979. The indictment was filed December 11, 1980. Appellant was convicted and sentenced to death in April of 1981. This Court remanded the cause to the trial court for a hearing so that the appellant could have the opportunity to demonstrate harm as a result of the trial court's error in overruling his motion to quash. *Janecka v. State*, 739 S.W.2d 813, 842 (Tex.Cr.App.1987). The trial judge then appointed a special master to preside

over the hearing and make findings of fact and conclusions of law. After several resettings, which were agreed to by both the State and appellant, the special master conducted the hearing and made findings of fact and conclusions of law. The trial court adopted the special master's findings and conclusions on March 11, 1988. Neither party objected to the appointment of the special master, his findings and conclusions, or the trial court's adoption thereof. On January 30, 1990, this Court reversed and remanded the cause based upon appellant's demonstration of harm in that the particular defect of form in the charging instrument prejudiced his substantial rights. On rehearing, the State now alleges for the very first time that the trial judge lacked the authority to appoint a special master to conduct a hearing on the subject of harm.

Specifically, the State argues that, unlike post conviction writ proceedings, no statute gives a district judge in Harris County the authority to appoint a special master to hold a hearing in a case on direct appeal. The State also points out that the order remanding the cause for a hearing specifically stated that "[t]he trial court shall hold a hearing to allow appellant to more fully develop his allegation of harm." The State contends that because the special master lacked authority to preside over the hearing, the entire proceeding is void *ab initio*, and a lawful hearing should now be held. Had the State objected at the time the master was appointed, or perhaps on submission before this Court, we might have reached the merits of its claim. However, as the State did not so object, we do not reach said claim.[1]

To preserve this issue for appellate review, the complaining party must make a timely and specific objection. Tex. R.App.Pro. 52(a).[2] It is well-settled that

---

1. We do note that while the trial court was ordered to "hold a hearing," a hearing was held, and the trial court made findings and conclusions based upon said hearing, the State had the opportunity to object to the manner and methodology of "holding" said hearing at the time it was held. An objection at that time would certainly have preserved the claimed error for review.

2. Of course, it is certainly very well-settled that some errors are so egregious that failure to object at trial does not waive later appellate review. See, for example, *Rose v. State*, 752 S.W.2d 529, 553 (Tex.Cr.App.1987); *Almanza v. State*, 686 S.W.2d 157, 171 (Tex.Cr.App.1984).

the purpose of requiring a timely specific objection is to allow the trial court to have the opportunity to make a determination and ruling on the complained of point and then to proceed with the trial under the proper procedural and substantive manners, as appropriately corrected by the trial court. Thus, the trial court is allowed to correct the complained of error at that time and to then proceed with the trial. In keeping with this rule, to preserve the issue of appointment of a master, a party must specifically object to the judge making the appointment. The objection must be made at the time of the appointment or at the earliest feasible opportunity thereafter. In this case, the State could have objected to the district judge at the time of the appointment. Instead, the State chose to fully participate in the proceeding before the master without raising its objection. Failure to timely object constitutes a waiver of error. The State's objection now in its motion for rehearing is anything but timely.

We observe that the enactment of Article 1.14(b) of the Texas Code of Criminal Procedure, effective December 1, 1985 pursuant to the approval of a constitutional amendment by the voters of Texas, evidences a trend toward economy and efficiency in criminal proceedings and away from the age-old practice of "sandbagging" and "lying behind the log" to belatedly raise issues of error. See *DeDonato v. State*, 819 S.W.2d 164 (Tex.Cr.App.1991); *State v. Oliver*, 808 S.W.2d 492, 494 (Tex. Cr.App.1991); *Studer v. State*, 799 S.W.2d 263, 273 (Tex.Cr.App.1990).

We also observe that in the instant cause the State does not aver that a new hearing, conducted specifically by the judge of the trial court, would adduce any new facts which would result in different findings of fact and conclusions of law. The State does aver that "[t]he entire harm hearing is a house of cards which could have been exposed by a presiding judge familiar with what happened at the trial of this case," and complains that the problem with allow-

ing the [s]pecial [m]aster to preside was that "no one could remember what happened during the trial which occurred over seven years before." Thus, it would seem that the State's primary complaint about the hearing was the familiarity with the original proceedings of the person presiding. The State points out that while the judge who had presided over the original proceedings was no longer on the bench, he often was a visiting judge in Harris County district courts and could have easily been substituted in. While such might satisfy the State, there is no indication that such would be done if this cause were remanded for yet another hearing over ten years after trial.

As we stated in *State v. Murk*, 815 S.W.2d 556 (Tex.Cr.App.1991), "If one is inclined to complain of error on appeal, the rule is to raise it at trial or it is waived on appeal." Because the State failed to timely object, any claim of error in the appointment of a master was waived. The State's motion for rehearing is hereby overruled.[3]

CAMPBELL, J., dissents for the reasons stated in his dissenting opinion filed in this cause on January 31, 1990, *Janecka v. State*, 823 S.W.2d 232 (Tex.Cr.App.1990).

WHITE, Judge, dissenting.

I dissent to the majority's holding that the State (because of no objection) failed to preserve for appeal the issue of the trial court's lack of authority to appoint a Special Master to conduct a hearing on the subject of whether appellant was harmed as a result of the trial court's decision to overrule his motion to quash the indictment.

On original submission, this Court abated the appeal and remanded the case to the trial court. In our remand order, this Court commanded that,

> "The *trial court* shall hold a hearing to allow appellant to more fully develop his allegation of harm."

*Janecka v. State*, 739 S.W.2d 813, at 842 (Tex.Cr.App.1987). On remand, the trial

---

**3.** The State's other arguments which are alleged in its motion do not present any new bases

sufficiently justifying further discussion or granting of the motion.

court (instead of following this Court's specific order) appointed a Special Master to conduct the hearing to determine if appellant could establish that he was harmed by the defect in form in the indictment.

In its motion for rehearing, the State presented the following argument in its second ground for rehearing:

"The State is aware that TEX.CODE CRIM.PROC.ANN. art. 11.07(d) authorizes a district court judge to appoint an attorney or a magistrate to hold a hearing and make findings of fact in post conviction writ proceedings. The State is also aware of Chapter 54 of the Government Code which authorizes masters, magistrates and referees for district courts in areas of family law, criminal law in Jefferson, Dallas and Tarrant Counties, civil law in Dallas County and juvenile referees/masters in Wichita and Harris Counties. However, the State is unaware of any authority allowing a Harris County district court judge to appoint an attorney as a master to hold a hearing in a case on direct appeal. Furthermore, the order of this Court in remanding the case for said hearing stated explicitly "The trial court shall hold a hearing to allow appellant to more fully develop his allegation of harm." *Janecka v. State, supra,* at 842.

"In *Herrod v. State,* 650 S.W.2d 814 (Tex.Cr.App.1983), this Court allowed a defendant to challenge, for the first time on appeal, the authority of a retired district court judge to preside over a criminal trial in a county court where the record failed to reflect by what authority the regularly elected judge had been replaced. At least the presiding trial judge in *Herrod* had been a duly elected judge and perhaps, given enough time, it could have been shown that he did have authority to preside (though it was not reflected in the appellate record)!

"Since the hearing in the present case was conducted by a person who had no authority to preside over it, it should be considered void ab initio. If a majority of this Court determines that the remunerator is a matter of requisite notice (and thus an element of the offense, at the option of the accused), then this Court should remand again for the trial court to follow this Court's order and conduct a lawful hearing at which the appellant can attempt to show harm."

Asserting reliance upon Tex.R.App.Pro. 52(a), the majority decided:

"to preserve the issue of appointment of a master, a party must specifically object to the judge making the appointment. The objection must be made at the time of the appointment or at the earliest feasible opportunity thereafter."

Because the State failed to do so in this case, the majority held that the State waived any error in the trial court's appointment of a Special Master. I respectfully disagree for several reasons.

First, the *Adams* hearing conducted by the Special Master was void ab initio because the trial court was not authorized by law to appoint a Special Master to conduct the hearing. I find that the State's citations in support of this, which are set out above, are correct. The Special Master had no jurisdiction to preside at the hearing. For the purpose of complying with the remand order of this Court on direct appeal, it was as if no hearing had been conducted at all.

*Herrod v. State,* 650 S.W.2d 814 (Tex.Cr. App.1983), cited by the State, supports this conclusion. In *Herrod,* there was no proof that the Presiding Judge of the First Administrative District had assigned the retired district judge to preside over the hearing in county court. There was also no statutory authorization for the retired district judge to sit in such capacity without a formal order of assignment. This Court concluded that since he was not authorized to sit in that case, the proceedings which he conducted were void. *Herrod, supra.* In the instant case, the Special Master was also not authorized by statute, to conduct the hearing on the harmfulness of the error of notice in the indictment.

This Court has also relied upon the concept of void ab initio in analogous situa-

tions.[1] In *Smith v. State*, 406 S.W.2d 455, at 456 (Tex.Cr.App.1966), this Court discussed how a complaint which had been added to, or altered, after it was sworn to by the affiant would cause the entire proceeding thereafter to be rendered void ab initio.

In *Heath v. State*, 817 S.W.2d 335 (Tex. Cr.App.1991), a trial court assessed a sentence which was not authorized by statute. This Court held that the sentence and judgment were therefore void. The proceedings which were held, even though they were entered into pursuant to a plea bargain in which the defendant agreed to accept the sentence, were abrogated. This Court reversed the defendant's conviction and remanded the cause to the trial court for new proceedings upon the indictment. See, also *Levy v. State*, 818 S.W.2d 801, 802 (Tex.Cr.App.1991) (In which the sentence assessed against the defendant was held to be void); and *Fullbright v. State*, 818 S.W.2d 808, 809 (Tex.Cr.App.1991) (In which a prior conviction used for enhancement was found to be void).

In the instant case, the majority does not reach the merits of the State's argument that the Special Master's hearing was void ab initio. Instead, the majority holds that it need not reach the merits of that argument because the State failed to preserve the issue by an objection. In light of the facts that the defendant in *Herrod* did not raise that issue at the "earliest feasible opportunity" (He raised no objection or complaint at his trial. *Herrod*, 650 S.W.2d, McCormick's dissent, at 818), and that the defendants in *Heath, Levy* and *Fullbright*, failed to object to the propriety of their sentence at any time during the proceedings before the trial court, it appears that this Court has held in the past that it is not necessary to argue at trial that a proceeding is void in order to preserve that issue.

However in the instant case, the majority has decided that it was necessary for the State to object at the "earliest feasible opportunity" in order to preserve the issue of the Special Master's jurisdiction to conduct the hearing. The only visible distinction between the instant case, and *Herrod, Heath, Levy* and *Fullbright* is the identity of the party making the argument: in the instant case, the State is arguing the proceeding was void; whereas in *Herrod, Heath, Levy* and *Fullbright*, the respective defendants were arguing their proceedings were void. This is not a valid distinction. The majority should consistently apply the law in the instant case in the same manner that this Court applied it in *Herrod, Heath, Levy* and *Fullbright*. I find the double standard which the majority has created in the instant case is unjustified and unacceptable.

Second, the actions of the trial court in appointing the Special Master to conduct the hearing directly contravenes the order of this Court. In remanding the instant case for appellant to develop proof in support of his allegation that he was harmed by the failure of the indictment to give him notice of the identity of the remunerator, this Court ordered the trial court to hold a hearing. *Janecka*, 739 S.W.2d, at 842. This order commanded the trial court himself to conduct the said hearing so that he could listen to the evidence and make the findings of fact and conclusions of law that he personally considered to be appropriate. His unauthorized delegation of this responsibility to a Special Master violated the order of this Court. As of this date, the trial court has still not complied with the order of this Court. This, alone, is a sufficient reason for this Court to remand the instant case to the trial court for him to comply with our order to conduct the hearing.

1. Cf. *Reyes v. State*, 753 S.W.2d 382 (Tex.Cr.App. 1988), and cases cited therein (in which this Court held that TEX.CODE CRIM.PROC.ANN. art. 32A.02, the Texas Speedy Trial Act, was unconstitutional and void ab initio. This Court stated that the statute was void from its inception and could not provide a basis for any right or relief. It could not justify or support any act performed under it.); see, also, *Jefferson v. State*, 751 S.W.2d 502 (Tex.Cr.App.1988); *Stevenson v. State*, 751 S.W.2d 508, at 508–509 (Tex.Cr.App.1988); *Sanchez v. State*, 751 S.W.2d 514, at 515 (Tex.Cr.App.1988); and *Forte v. State*, 759 S.W.2d 128, at 138 (Tex.Cr.App.1988).

Third, the majority set a contemporaneous trial objection requirement for the State to meet whenever they discover that a proceeding is void. (Since the majority has not distinguished, or overruled, *Herrod, Heath, Levy* and *Fullbright,* I assume they do not intend for their contemporaneous trial objection requirement to apply to defendants but only to the State.). I find this requirement to be impractical and unworkable. The trial court's unauthorized appointment of the Special Master in the instant case was an administrative action. This type of action often takes place outside the courtroom and within the offices of a judge, away from the presence of the State and the defendant. There is often no opportunity for a contemporaneous objection by either party. The "earliest feasible opportunity" standard concocted by the majority invites an arbitrary, ad hoc approach to determining whether or not the State has preserved error. I find it to be wholly unacceptable.

I would sustain the State's ground for rehearing, and remand this cause to the trial court for proceedings consistent with our original, and as yet unsatisfied, order. This Court should be consistent in its rulings or at least overrule prior case law. Recently we have decided at least three cases which hold that when a trial court is not authorized by law to act, there need not be an objection to the contrary, and also that the act is void.[2] I dissent to the aggressive and assertive majority's decision to overrule the motion for rehearing.

McCORMICK, P.J., and BENAVIDES, J., join this dissent.

---

**2.** *Heath v. State,* 817 S.W.2d 335; *Levy v. State,* 818 S.W.2d 801; and *Fullbright v. State,* 818